PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-2166

_____

UNITED STATES OF AMERICA

v.

HENRY FREEMAN,
                              Appellant

_____

On Appeal from the District Court
of the Virgin Islands
(D.C. Criminal No. 3-06-cr-00080-004)
District Judge:  Honorable Curtis V. Gomez

_____

Argued December 9, 2013
Before:  FISHER, COWEN and NYGAARD, Circuit Judges

———

No. 10-4224

———

UNITED STATES OF AMERICA

v.

GELEAN MARK,
Appellant

———

On Appeal from the District Court
of the Virgin Islands
(D.C. No. 3-06-cr-00080-001)
District Judge:  Honorable Curtis V. Gomez

———

Argued December 9, 2013
Before:  FISHER, COWEN and NYGAARD, Circuit Judges

(Filed: August 18, 2014)

Dale L. Smith, Esq. **(ARGUED)**
Suite 1600
99 Park Avenue
New York, NY 10016

*Counsel for Appellant Henry Freeman*


Pamela L. Colon, Esq. **(ARGUED)**
27 & 28 King Cross Street,

Phoenix Court Business Complex
Christiansted, VI 00820

*Counsel for Appellant Gelean Mark*


Nelson L. Jones, Esq.  **(ARGUED)**
Delia L. Smith, Esq.
Office of United States Attorney
5500 Veterans Building, Suite 260
United States Courthouse
St. Thomas, VI 00802-6924


*Counsel for Appellee*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*

Henry Freeman and Gelean Mark appeal from their individual judgments of conviction and sentence entered by the District Court of the Virgin Islands for conspiracy to possess with intent to distribute a controlled substance. We will resolve these unconsolidated appeals together because they arise from a common factual background and were tried together before the same District Court. Each defendant alleges a series of legal and procedural errors on the part of the District Court during trial and at sentencing. We will affirm as to Freeman, but we will vacate and remand for resentencing as to Mark.

## I. BACKGROUND

### A. Factual History

On December 19, 2006, Freeman and Mark were charged by a federal grand jury in a fourteen-count indictment[1] for their part in a conspiracy to import substantial quantities of cocaine throughout the United States via commercial aircraft at the Cyril E. King Airport located in St. Thomas, United States Virgin Islands. Count I of the

---

[1] The indictment also charged Vernon Fagan, Walter Ells, Kelvin Moses, Craig Claxton, Kerry Woods, Glenson Isaac, Everette Mills and Dorian Swann. Claxton and Woods have separately appealed, and those appeals will be separately

4

indictment charged both Freeman and Mark with conspiracy to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 846. The government alleged that both Freeman and Mark, along with four other defendants:

> [D]id knowingly and intentionally, combine, conspire . . . and agree together . . . to knowingly and intentionally possess with intent to distribute a controlled substance, namely five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine, . . . in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii)(II).

Freeman App. at 24. Count II charged Mark, along with two others, with conspiracy to import cocaine, in violation of 21 U.S.C. § 963. Counts III-XIII charged both Freeman and Mark, along with two others, with possession of cocaine on board an aircraft, in violation of 21 U.S.C. § 955. Mark was charged in Count XIV with possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841.

## B. Procedural History

### (1) The Trial

Freeman's and Mark's trial commenced on September 5, 2007. The government presented its evidence against the defendants through the testimony of several cooperating witnesses. James Springette and Elton Turnbull, established leaders in the drug conspiracy, set forth an overview of the

conspiracy. Turnbull testified that he recruited Mark into the drug trafficking organization in late 1999 because of his connections with employees at the Cyril E. King Airport. Turnbull testified that Mark's role in the conspiracy primarily consisted of the movement of narcotics through the airports to North Carolina and that he and Mark shared the responsibility of finding the drug couriers. Turnbull testified that once the drugs arrived in St. Thomas, Mark stored the drugs until it was time to transport them to North Carolina.

Glenson Isaac, a fellow co-conspirator and a cooperating witness for the government, testified against both Mark and Freeman. He testified that after Turnbull's arrest, he sold drugs under Mark, with Freeman acting as the middle person, and that he used Mark's route going through Charlotte, North Carolina, to transport the drugs from St. Thomas. Isaac testified that Mark arranged for the trafficking of multi-kilogram loads of cocaine from St. Thomas to North Carolina with him on numerous occasions and that Freeman advised him as to whom the courier would be in a number of those deliveries. He also testified that he met with both Mark and Freeman in St. Thomas to discuss and plan ways to transport cocaine from the Virgin Islands to North Carolina and, finally, presented an organizational chart of the drug organization, identifying Mark as a key supplier of cocaine.

Following the testimony of the government's witnesses, defense counsel was afforded an opportunity to cross-examine each of the government's witnesses. At the close of the government's case, the District Court dismissed Counts III through XIII against both Freeman and Mark, pursuant to Rule 29 motions for judgments of acquittal. The District Court denied the motions as to the remaining counts.

*(2) The Jury Instructions*

6

Both Freeman and Mark presented their proposed jury instructions to the District Court, which included an instruction that the government must prove the existence of "five or more kilograms of cocaine" as an essential element of Count I. The District Court rejected this request, instead instructing the jury, along with all of the other elements of conspiracy, that they need only find that the conspiracy involved a "measurable amount of the controlled substance alleged in the indictment." Freeman and Mark also objected to the court's "measurable amount of cocaine" instruction, but their objection was overruled.

After five days of deliberation, the jury returned guilty verdicts for both Mark and Freeman as to Count I, but failed to reach a decision as to Mark's charges in Counts II and XIV. Following the guilty verdict on Count I, the District Court submitted to the jury the following in the form of a post-verdict question: "[a]s to Count 1, conspiracy with intent to distribute a controlled substance, do you find that five kilograms or more was involved[?]" After a period of deliberation, the jury failed to arrive at a unanimous decision. Mark's retrial on Counts II and XIV was scheduled for a later date.[2]

### (3) Freeman's Sentencing

---

[2] Mark's retrial on Counts II and XIV was scheduled to commence on May 24, 2010. Mark was to be on trial along with several of his co-defendants, who were arrested after the first trial and were to be tried on different counts of the indictment. Just before that trial, however, the government moved to dismiss Counts II and XIV against Mark. As a result, Mark was never retried.

Freeman's sentencing hearing was held on April 15, 2009. Prior to sentencing, the United States Probation Office prepared a presentence investigation report ("PSR"), which categorized Freeman's base offense level at 12 because "the jury did not find an amount of controlled substances attributable to [him]." The PSR then increased his base offense level by four levels, pursuant to U.S.S.G. § 3B1.1(a), due to his role in the conspiracy as "an organizer and leader of criminal activity that involved five or more participants." It also assigned Freeman a criminal history score of I. Based upon these calculations, the PSR's final recommendation for Freeman was a base offense level of 16 and a criminal history category of I, resulting in a guidelines range of 21 to 27 months in prison.

Freeman's PSR was amended twice by the Probation Office between the date of the initial PSR and the sentencing hearing. During that interim period, Freeman raised a number of objections to his base offense level and his role in the offense. The District Court held a hearing on October 2, 2008 to allow the parties to set forth their arguments regarding those objections. At the conclusion of the hearing, the District Court found that there was sufficient evidence presented at trial to support a finding that Freeman was "a manager and a supervisor" in the conspiracy. *See* Transcript of Proceedings at 26-28, *United States v. Freeman*, No. 3:06-cr-00080-CVG-RM (D.V.I. Jan, 29, 2009), ECF No. 724. The Court then found, based upon a preponderance of the evidence, that Freeman "conspire[d] with intent to distribute . . . at least 50 kilograms of cocaine." *Id.* at 28-30.

The PSR was thereafter amended to reflect the District Court's finding that Freeman had conspired to distribute a minimum of fifty kilograms of cocaine. His base offense level was set to 36, and then increased by three levels for his

role as an organizer of criminal activity involving five or more participants. Following these adjustments, the PSR recommended a base offense level of 39 and a criminal history category of I, resulting in a guidelines range of 262 to 327 months of imprisonment.

At the sentencing hearing, Freeman again raised several objections to the final PSR. Specifically, he objected to the District Court's findings of fact regarding the quantity of cocaine attributable to him and the resulting sentencing guideline range given the jury's failure to make any actual findings as to the quantity of cocaine involved in the conspiracy. The government argued that the Court should find that 89.5 kilograms of cocaine were attributable to Freeman and that, instead of a three-level increase for his role as an organizer in the conspiracy, a two-level increase (to 38) should be imposed, providing for a sentence range of 235 to 293 months' imprisonment. Given the statutory maximum sentence of 20 years applicable to the offense, however, the government asked the Court to impose a sentence between 188 and 240 months' imprisonment. After hearing argument from both parties, the Court sentenced Freeman to 188 months' imprisonment.

### (4) Mark's Sentencing Hearing

Mark's sentencing hearing was held on October 19, 2010. His initial PSR, like Freeman's, categorized his base offense level at 12 because the jury did not find an amount of controlled substances attributable to him. His base offense level was then increased by four levels, pursuant to U.S.S.G. § 3B1.1(a), due to his role in the offense as "an organizer and leader of criminal activity that involved five or more participants." He had a criminal history score of I. Mark's

base offense level of 16 and criminal history category of I resulted in a guidelines range of 21 to 27 months in prison.

The Probation Office amended Mark's PSR following its receipt of reports from an investigation conducted by the Drug Enforcement Administration. Those reports detailed Mark's involvement with various amounts of cocaine during the conspiracy and attributed to him a total of 96.5 kilograms of cocaine. Following the inclusion of that information into the PSR, Mark was assigned a new base offense level of 36. The PSR then increased his base offense level by four levels, pursuant to U.S.S.G. § 3B1.1(a), and arrived at an adjusted offense level of 40. Based upon those new calculations, Mark's guidelines range increased to 292 to 365 months in prison.

Mark raised his objections to the amended PSR at his sentencing hearing. He specifically objected to the quantity of cocaine attributed to him in the PSR, given the jury's inability to reach a conclusion regarding a specific quantity of cocaine, and the increase in his base offense level for his role in the conspiracy. After the Court heard argument from both parties, the Court found that Mark was responsible for 15 to 50 kilograms of cocaine, which lowered his base offense level to 34 instead of 36, and that there was sufficient evidence in the record to warrant a three-level adjustment for his role in the conspiracy. The District Court then added three levels to his adjusted base offense level of 34, arriving at an adjusted offense level of 37, and concluded that Mark's new guidelines range was 210 to 262 months in prison. The Court then sentenced Mark to a term of 210 months' imprisonment.

This appeal followed.[3]

## III.  DISCUSSION

Because Mark and Freeman both challenge the District Court's jury instructions regarding Count I of the indictment, we will address that aspect of the two appeals together in Part III.A.  We will address Mark's and Freeman's challenges to their sentencing decisions in Part III.B.  The remainder of the issues raised in Freeman's appeal will then be addressed in Part III.C and the remainder of the issues raised in Mark's appeal will be addressed in Part III.D.

### A.  Jury Instructions

Freeman and Mark first argue that the District Court erred when it instructed the jury on the elements of drug conspiracy.  They specifically argue that, in order for a conviction to be obtained against them on Count I, the government had to prove the existence of "5 kilograms or more of cocaine" as charged in the indictment.

Our review of a trial court's jury instructions, regarding both phrasing and omissions, is for abuse of discretion. *United States v. Bobb*, 471 F.3d 491, 499 (3d Cir. 2006).  "In reviewing a refusal to give a requested jury instruction," *see id.*, we evaluate "whether the proffered instruction was legally correct, whether or not it was substantially covered by other instructions, and whether its omission prejudiced the defendant," *United States v. Pitt*, 193 F.3d 751, 755-56 (3d Cir. 1999)).

---

[3] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231.  We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

The statutory provision under which Freeman and Mark were charged in the indictment, 21 U.S.C. § 841(a)(1), provides: "it shall be unlawful for any person knowingly or intentionally – to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."  We have previously stated that the elements of the base offense therefore include: "(1) knowing or intentional (2) possession (3) with intent to distribute (4) a controlled substance."  *United States v. Lacy*, 446 F.3d 448, 454 (3d Cir. 2006).  The District Court's instruction to the jury mirrored our interpretation of the elements of the base offense.  The instruction specified that:

> In order to sustain its burden of proof for the crime of conspiracy to possess with intent to distribute a controlled substance . . . , the government must prove the following essential elements beyond a reasonable doubt:

> First, that no later than 1999, and continuing until October 2005, *a conspiracy, agreement or understanding to possess with intent to distribute a controlled substance, as described in the indictment, was formed, reached, or entered into by two or more persons*;

12

And second, that at some time during the existence or life of the conspiracy, agreement, or understanding, *the defendant knew the purpose of the agreement, and with that knowledge then deliberately joined the conspiracy, agreement, or understanding*.

. . .

The evidence received in this case need not prove the actual amount of the controlled substance alleged in the indictment.

*The government must prove beyond a reasonable doubt, however, that a measurable amount of the controlled substance alleged in the relevant count of the indictment that you are considering was, in fact, involved.*

Transcript of Proceedings at 24, 34 United States v. Mark, No. 3:06-cr-00080-CVG-RM (D.V.I. Mar. 18, 2008), ECF No. 641.

Freeman's and Mark's indictment did not just charge the base offense, however, it specified a particular drug type and amount, namely, "five (5) kilograms or more of cocaine,"

13

in violation of 21 U.S.C. § 841(b)(1)(A)(ii)(II). The drug type and amount, for purposes of 21 U.S.C. § 841, serve to increase the statutory maximum penalty allowed once a conviction is obtained. *See* 21 U.S.C. § 841(b). Following the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), those types of facts must be submitted to a jury and proved beyond a reasonable doubt. *Id.* at 490 ("[A]ny fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). This is so because such facts are treated as the "functional equivalent[]" of an element of a greater offense. *Lacy*, 446 F.3d at 454 (quoting *Apprendi*, 530 U.S. at 494 n.19). The essential elements of Freeman's and Mark's charged offense are, therefore,: (1) knowing or intentional (2) possession (3) with intent to distribute (4) five kilograms or more (5) of cocaine.

It is clear, here, that the District Court did not instruct the jury as to the fourth element – the existence of "five kilograms or more." However, this point does not prove fatal to the jury charge. Rule 31(c) of the Federal Rules of Criminal Procedure informs our analysis. *See, e.g., Government of Virgin Islands v. Douglas*, 812 F.2d 822, 826 (3d Cir. 1987) (noting that Rule 31(c) allowed the judge to substitute a charge on the lesser included offense of attempted aggravated rape for the original charge of aggravated rape); *United States v. Lucien*, 61 F.3d 366, 372 (5th Cir. 1995) (noting that Rule 31(c) allows a district court to give a lesser-included offense instruction where certain requirements are met).

Rule 31(c) provides, in pertinent part, that "[a] defendant may be found guilty of . . . an offense necessarily included in the offense charged." Fed. R. Crim. P. 31(c). An "offense is not 'necessarily included' in another unless the

14

elements of the lesser offense are a subset of the elements of the charged offense." *Lacy*, 446 F.3d at 452 (quoting *Schmuck v. United States*, 489 U.S. 705, 716 (1989)). A lesser included offense instruction would be improper, therefore, "where the [potential lesser included offense] requires an element *not required* for the greater offense." *Id.* (emphasis added) (quoting *Schmuck*, 489 U.S. at 716). Such a rule protects defendants' "rights by ensuring that they have 'constitutionally sufficient notice' that they face conviction on all lesser included offenses." *Id.*; *see also Walker v. United States*, 418 F.2d 1116, 1119 (D.C. Cir. 1969) (noting that the indictment is sufficient notice to a defendant that he may be called to defend a lesser included charge); *accord Fransaw v. Lynaugh*, 810 F.2d 518, 529 (5th Cir. 1987); *Seymour v. Walker*, 224 F.3d 542, 558 (6th Cir. 2000); *United States v. No Neck*, 472 F.3d 1048, 1053 (8th Cir. 2007).

In the instant case, without the essential element of "five kilograms or more," the District Court merely instructed the jury on the base offense, as described above. It follows, therefore, that in order to resolve the jury instruction issue raised by Freeman and Mark, we must determine whether the base offense, 21 U.S.C. § 841(a)(1), constitutes a lesser included offense of the charged offense, 21 U.S.C. § 841(b)(1)(A)(ii)(II). To do so, we must compare the elements of the charged offense with those of the base offense.

We have addressed this exact question before. In *Lacy*, we were tasked with determining, among other things, whether the district court properly charged the defendant with, and whether the jury properly convicted him of, two separate lesser included offenses. 446 F.3d at 455. There, the defendant was charged with possession with intent to distribute five grams or more of a substance containing a

15

detectable amount of cocaine base, or crack cocaine, in violation of 21 U.S.C. § 841(a) and (b). *Id.* at 450. A jury acquitted Lacy of the offense charged in the indictment, but convicted him of two lesser included offenses – simple possession of more than five grams of cocaine base, in violation of 21 U.S.C. § 844, and possession with intent to distribute an unspecified amount of cocaine base, in violation of 21 U.S.C. § 841(a)(1). Lacy focused his appeal on his simple possession conviction, arguing, among other things, that it was not a lesser included offense of possession with intent to distribute. We disagreed with Lacy in that regard, but also made a point to note that his conviction for possession with intent to distribute an unspecified amount of cocaine was a lesser included offense of his charged offense as well:

> It is also clear that the second offense of which Lacy was convicted – which he does not challenge on appeal – is a lesser included offense of the charged offense. *Possession with intent to distribute an unspecified quantity of cocaine base requires proof of a 'subset' of the facts that must be proved to sustain a conviction for possession with intent to distribute five grams or more of cocaine base* – everything except for the drug amount.

*Id.* at 455 (emphasis added). *Lacy* thus makes clear that § 841(a) – possession with intent to distribute an *unspecified*

16

quantity of controlled substance – constitutes a lesser included offense of § 841(b) – possession with intent to distribute a *specified* quantity of a controlled substance. It follows, then, that a conviction may be properly obtained under § 841(a) where the indictment alleges a violation of § 841(b).

On a final note, Freeman and Mark argue that the District Court's lesser included offense instruction (omitting the specified amount of cocaine) was improper in the instant case because there was no evidence to justify it. They argue that all of the evidence presented at trial consisted of testimony that they were involved with shipments of cocaine in excess of five kilograms and that there was never any dispute that the cocaine quantities at issue involved less than five kilograms. They claim that these facts demonstrate that a jury could not rationally find them guilty of the lesser offense and acquit them of the greater. We disagree. On the facts of this case, wherein multiple defendants participated at varying levels in a grand scheme involving the importation of cocaine, a jury could rationally conclude that the conspiracy involved the amounts of cocaine each witness testified to, but not attribute a specific amount (beyond a reasonable doubt) to a particular defendant. Furthermore, as Freeman and Mark acknowledge, the government's witnesses testified to varying amounts of cocaine, or a "measurable amount," which demonstrates that the District Court's lesser included offense instruction was indeed supported by the evidence. We will reject Freeman's and Mark's argument in this regard.

The District Court, therefore, properly charged the jury on possession with intent to distribute a "measurable amount" of cocaine as a lesser included offense of possession with intent to distribute five kilograms or more of cocaine. Freeman's and Mark's convictions will remain undisturbed.

*Government of Virgin Islands v. Aquino*, 378 F.2d 540, 554 (3d Cir. 1967) ("[T]here may be a conviction of a crime which is necessarily included within the higher offense charged.").

## B. Sentencing Errors

We now turn to Mark's and Freeman's allegations of error at their individual sentencing hearings. Freeman and Mark both argue that their sentences should be reversed because they were imposed with judicial factfinding as to drug quantities, using a preponderance of the evidence standard, in violation of *Alleyne v. United States*, 133 S. Ct. 2151 (2013). [4] Both also challenge the adequacy of the District Court's factfinding regarding their drug quantity determinations. Mark also argues separately that the District Court erred at his sentencing hearing by: (1) failing to find a specific amount of cocaine attributable to him in the conspiracy; (2) failing to state a factual basis for imposing aggravating role enhancements; (3) failing to address his request for a downward departure based upon his allegations of serial prosecution; and (4) mistakenly requiring parity of sentence between him and his co-defendants.

---

[4] Following the Supreme Court's decision in *Alleyne*, and after the parties had already submitted their original briefs, our Court directed the parties to submit supplemental letter briefs regarding the impact of *Alleyne* on the District Court's sentencing decision. Both defendants argued that *Alleyne* counseled in favor of a remand for resentencing. Prior to *Alleyne*, Freeman's and Mark's only arguments in this regard challenged the adequacy of the District Court's factual findings.

18

We review a district court's sentencing decision for an abuse of discretion, which proceeds in two stages of analysis. *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc). We first review for procedural error, ensuring that the district court: (1) correctly calculated the defendant's advisory Guidelines range; (2) appropriately considered any motions for a departure under the Guidelines; and (3) gave meaningful consideration to the sentencing factors set forth in 18 U.S.C. § 3553(a). *United States v. Wright*, 642 F.3d 148, 152 (3d Cir. 2011). If the district court has committed procedural error, "'we will generally remand the case for re-sentencing, without going any further.'" *United States v. Begin*, 696 F.3d 405, 411 (3d Cir. 2012) (quoting *Wright*, 642 F.3d at 152). If the sentencing decision passes the first stage of review, we then consider the substantive reasonableness of the sentence. *United States v. Levinson*, 543 F.3d 190, 195 (3d Cir. 2008). We will find a sentence to be unreasonable only where "no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." *Tomko*, 562 F.3d at 568.

### *(1)* Alleyne *Error*

Freeman and Mark both argue that the District Court violated their Sixth Amendment rights by finding facts that increased the amount of cocaine attributable to each of them for purposes of their Guidelines calculations. They base their argument on *Alleyne*, where the Supreme Court held that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury" and found beyond a reasonable doubt. 133 S. Ct. at 2155. Freeman and Mark contend that, because the quantities found by the District Court, by only a preponderance of the evidence, "exposed" them to a statutory minimum sentence of ten years'

19

incarceration, *see* 21 U.S.C. § 841(b)(1)(A)(ii)(II), the District Court's factfinding violated *Alleyne*. We disagree.

While the Supreme Court made clear that any fact that increases a defendant's statutory minimum sentence must be found by a jury beyond a reasonable doubt, this rule does not foreclose a district court's ability to engage in some judicial factfinding. *See Alleyne*, 133 S. Ct. at 2158. Indeed, the Supreme Court made this point perfectly clear in its decision. *See id.* at 2163 ("Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment."); *see also id.* at 2170 ("'Nothing in this history suggests that it is impermissible for judges to exercise discretion – taking into consideration various factors relating both to offense and offender – in imposing a judgment within the range prescribed by statute.'" (emphasis omitted) (quoting *Apprendi*, 530 U.S. at 481)).

In that regard, a number of courts, including our own, have agreed that "factual findings made for purposes of applying the Guidelines, which influence the sentencing judge's discretion in imposing an advisory Guidelines sentence and do not result in imposition of a mandatory minimum sentence, do not violate the rule in *Alleyne*." *United States v. Ramirez-Negron*, 751 F.3d 42, 48 (1st Cir. 2014) (collecting cases); *see also United States v. Smith*, 751 F.3d 107, 117 (3d Cir. 2014) ("*Alleyne* did not curtail a sentencing court's ability to find facts relevant in selecting a sentence *within* the prescribed statutory range." (emphasis in original)); *United States v. Valdez*, 739 F.3d 1052, 1054 (7th Cir. 2014) (finding no error in a district court's factual findings regarding drug quantity, which were used solely for purposes of determining the defendant's Guidelines range,

20

where there was "no indication . . . that the district judge thought her sentencing discretion was cabined by a higher statutory minimum"); *United States v. Johnson*, 732 F.3d 577, 584 (6th Cir. 2013) (finding no *Alleyne* error where district court's factual findings did not alter the prescribed statutory penalties). We apply the same here.

The statutory sentencing range supported by the jury's verdict as to both Freeman and Mark ranged from a period of no incarceration to a maximum of 20 years' incarceration. *See* 21 U.S.C. § 841(b)(1)(C) (no drug quantity finding). Following that verdict, the District Court found that Freeman was responsible for at least 50 kilograms of cocaine and that Mark was responsible for 15 to 50 kilograms. These findings, made for purposes of determining their applicable Guidelines ranges, were permissible under *Alleyne*, so long as the ultimate sentence imposed was within the statutorily prescribed range. Mark was ultimately sentenced to a term of 210 months of imprisonment and Freeman was sentenced to 188 months. Both sentences are well within the twenty-year statutory maximum term allowed under 21 U.S.C. § 841(b)(1)(C).

We note further that there is no indication in the record that the District Court believed that its sentencing discretion was confined to a higher statutory minimum given its drug quantity findings. Freeman and Mark's alleged "exposure" to a sentencing range with a low end of ten years of incarceration bears little on our inquiry into what the District Court *actually relied upon* in imposing their respective sentences. *See Ramirez-Negron*, 751 F.3d at 51 ("The fact that [a defendant's] sentence falls above [a mandatory minimum] is insufficient to establish that the mandatory minimum governed or that an *Alleyne* error occurred."). With that said, our review of both sentencing transcripts reveals no

21

reliance by the District Court on any sentencing minimum other than that prescribed by § 841(b)(1)(C), which is fully supported by the jury's verdict. *See*, *e.g.*, Transcript of Proceedings at 19, United States v. Mark, No. 3:06-cr-00080-CVG-RM (D.V.I. Mar. 25, 2011), ECF No. 1308 ("I think with respect to Mr. Mark, it's clear, there's no finding beyond a reasonable doubt that would require a minimum mandatory . . . So I don't think that's even an issue."); *see also* Transcript of Proceedings at 31, United States v. Mark, No. 3:06-cr-00080-CVG-RM (D.V.I. Feb. 18, 2010), ECF No. 903 (Government stating to the District Court: "Given, however, that [Freeman] has a statutory limitation of 0 to 20 years, we would ask the Court to fashion a sentence between 188 and 240 months, as provided by law."). There is no *Alleyne* error in Freeman's and Mark's cases.[5]

### (2)  The District Court's Findings of Fact

Along with their claims of error under *Alleyne*, Freeman and Mark also challenge the adequacy of the District Court's factual findings regarding the quantity of drugs attributable to each of them. We review a district court's findings of fact regarding quantity of drugs for clear error. *United States v. Gibbs*, 190 F.3d 188, 204 (3d Cir. 1999).

The Federal Rules of Evidence do not apply in

---

[5] At oral argument, the government conceded error on the part of the District Court and agreed that both Freeman's and Mark's cases should be remanded for resentencing. We decline the government's invitation as to Freeman, as the record sufficiently demonstrates that the District Court's factual findings were made solely for the purpose of imposing an advisory Guidelines sentence and not for the imposition of any mandatory minimum.

sentencing proceedings. Fed. R. Evid. 1101(d)(3). "This does not mean, however, that there is no threshold requirement for admissibility." *United States v. Miele*, 989 F.2d 659, 663 (3d Cir. 1993). "[I]n order to avoid 'misinformation of constitutional magnitude,'" *United States v. Brothers*, 75 F.3d 845, 848 (3d Cir. 1996) (quoting *United States v. Sciarrino*, 884 F.2d 95, 98 (3d Cir. 1996)), "we require that 'information used as a basis for sentencing under the Guidelines . . . have sufficient indicia of reliability to support its probable accuracy.'" *Id.* (quoting *Miele*, 989 F.2d at 663); *see also* U.S.S.G. § 6A1.3(a); *United States v. Yeaman*, 194 F.3d 442, 463 (3d Cir. 1993). "Indicia of reliability may come from, *inter alia*, the provision of facts and details, corroboration by or consistency with other evidence, or the opportunity for cross-examination." *See United States v. Smith*, 674 F.3d 722, 732 (7th Cir. 2012) (internal quotation marks and citations omitted).

We follow a number of other circuits in applying this standard. *See, e.g., United States v. Simmons*, 964 F.2d 763 (8th Cir. 1992) (vacating defendant's sentence because the drug quantity finding was based on testimony of a drug addict with impaired memory); *United States v. Shacklette*, 921 F.2d 580 (5th Cir. 1991) (vacating sentence because district court relied solely on probation's officer's conclusory statement as to drug quantity involved); *United States v. Cammisano*, 917 F.2d 1057 (8th Cir. 1990) (vacating sentence because uncorroborated testimony of FBI agents that defendant was member of organized crime was not sufficiently reliable); *United States v. Robison*, 904 F.2d 365 (6th Cir. 1990) (vacating sentence because drug quantity estimates provided by witness who was heavy drug user lacked sufficient indicia of reliability)). In doing so, we apply this standard rigorously. *Miele*, 989 F.2d at 664.

23

We address Freeman's and Mark's arguments of error with respect to the District Court's factual findings separately.

### a. Freeman

In support of his argument for resentencing, Freeman analogizes his case to *Miele*, a case in which a defendant's sentence was vacated and the case remanded for resentencing based upon the district court's failure to meet the Guidelines' sufficient indicia of reliability standard. 989 F.2d at 660. There, the defendant was indicted for conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. *Id.* at 661. At trial, the principal government witness was an addict-informant who provided inconsistent testimony. *Id.* at 662. Without explanation, and over the defendant's objections to the court's reliance on the addict-informant's testimony in fashioning his sentence, the court concluded that the defendant was responsible for "in excess of five kilos," and sentenced him accordingly. *Id.*

On appeal, the defendant argued that the district court's drug quantity finding was not supported by a preponderance of the evidence and, thus, his base offense level was calculated incorrectly. *Id.* We agreed, noting "the numerous inconsistencies in the record, the fact that the source of most of the critical evidence was an addict-informant with an impaired memory, and the lack of any findings by the district court other than a single conclusory finding as to drug quantity." *Id.* at 660. We also noted that there was no indication in the record that the district court made any findings to resolve the defendant's challenge to the drug quantity estimate in his PSR. *Id.* at 665. We observed that this failure alone was grounds for vacating the defendant's sentence and remanding for further proceedings. *Id.*

Freeman argues that, similar to *Miele*, the District

Court failed to provide an explanation as to why Isaac's testimony was sufficient for the quantity finding. Freeman points out that he made the court aware of all the evidence that he believed diminished Isaac as a reliable witness, including his contention that Isaac's testimony failed to establish: (1) that drug proceeds should have been forfeited; (2) that five kilograms or more of cocaine was involved in the conspiracy; and (3) the amount of cocaine attributable to Freeman in his individual capacity. Freeman's arguments are unavailing. Our review of the record reveals that the District Court provided ample explanation at Freeman's sentencing hearing as to the basis upon which it relied in attributing at least 50 kilograms of cocaine to Freeman and that it was justified in doing so:

> The testimony, again, of Mr. Isaac . . . indicates that there were a number of deliveries in which Mr. Isaac was involved in, which he testified that Mr. Mark and Mr. Freeman were involved, and those deliveries certainly exceeded 50 kilograms of cocaine. . . . [T]he Court agrees with the defense that the jury could not agree on an amount . . . But for Guideline purposes, the Court has to determine something that the jury doesn't, and that is determine whether there is a preponderance of the evidence, not beyond a reasonable doubt . . . Looking at all the evidence, and indeed looking at the evidence presented

by Mr. Isaac, and the corroboration offered by the couriers, who indeed corroborated significant portions of his testimony, they certainly testified that they did many of the things that he testified about. So the Court finds that there is a preponderance of the evidence to make the finding that [Freeman] . . . did, in fact, possess with intent to – or conspire with intent to distribute between – at least 50 kilograms of cocaine.

Transcript of Proceedings at 28-30, United States v. Mark, No. 3:06-cr-00080-CVG-RM (D.V.I. Feb. 18, 2010), ECF No. 724.

The District Court correctly observed that it was required to adhere to a preponderance of the evidence standard in making its determination, and then assessed all of the evidence presented while applying that standard. In doing so, it addressed the testimony of both Isaac and other drug couriers. While the District Court does appear to rely heavily on Isaac's testimony, it supports this reliance by noting that his testimony was corroborated significantly by other drug couriers. *See Smith*, 674 F.3d at 732 (noting that indicia of reliability may come from both corroboration and consistency with other evidence). Even without corroboration, we find no error in the District Court's reliance on Isaac's testimony. *See Gibbs*, 190 F.3d at 204 (recognizing that courts have estimated drug quantities based on testimony by a co-

26

defendant (citing *United States v. Maggard*, 146 F.3d 843, 848 (8th Cir. 1998))). Unlike the witness in *Miele*, Isaac was not an addict-informant, nor did he present himself in any other way that would require additional caution in relying on his testimony. In light of the record before us, we cannot say that the District Court committed clear error in relying on Isaac's testimony to determine a specific quantity of cocaine for purposes of imposing sentence. We will, therefore, affirm the District Court's determination of the quantity of drugs in Freeman's case.[6]

### b. Mark

The record is not as clear in Mark's case. At his

---

[6] Freeman also argues that he has maintained an "as applied" Sixth Amendment challenge, basing this challenge upon the argument that his within-Guidelines sentence of 188 months would be substantively unreasonable in the absence of the District Court's factual findings. We are unpersuaded by this argument, as every court to consider the issue, including our own, has rejected it. *See Grier*, 475 F.3d at 564-65 (observing that the only facts a jury must determine are those "that increase the statutory maximum punishment"); *accord United States v. Hernandez*, 633 F.3d 370, 373-74 (5th Cir. 2011); *United States v. Treadwell*, 593 F.3d 990, 1017 (9th Cir. 2010); *United States v. Ashqar*, 582 F.3d 819, 824-25 (7th Cir. 2009); *United States v. White*, 551 F.3d 381, 386 (6th Cir. 2008); *United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008); *United States v. Redcorn*, 528 F.3d 727, 745-46 (10th Cir. 2008). Because the District Court imposed its sentence within the statutory maximum, and that statutory maximum was fully supported by the jury's verdict, the District Court's factual findings were proper. Freeman's Sixth Amendment as-applied challenge fails.

October 2010 sentencing hearing, Mark raised several objections to his amended PSR. As relevant to the instant appeal, Mark objected to the quantity of cocaine attributed to him and the resulting sentencing Guidelines range, given the jury's inability to make a specific determination as to the amount of cocaine involved in the conspiracy. After the District Court heard argument from both parties regarding Mark's role in the conspiracy and specific instances of trial testimony related to drug quantity, it stated:

> [T]he Court finds by a preponderance of the evidence that the appropriate level should be 15 to 50 kilograms. That's based on the information adduced at trial, which would put it at a base offense level of 34, instead of 36. . . .[T]he Court is mindful of relevant conduct and what it can consider, and there is an abundance of evidence that the Court cannot ignore.

Transcript of Proceedings at 48, United States v. Mark, No. 3:06-cr-00080-CVG-RM (D.V.I. Mar. 25, 2011), ECF No. 1308. Aside from these conclusory statements, the District Court offered no other explanation as to the basis for its findings.

We have previously noted that "if a defendant disputes a fact included in the presentence investigation report, the sentencing court must either resolve that dispute or state that it will not rely on the disputed fact." *Miele*, 989 F.2d at 665;

28

*see also* Fed. R. Crim. P. 32(i)(3)(B). As noted above, Mark's counsel made a number of objections to the PSR, but the District Court's short, conclusory response left much to be desired regarding what testimony and/or evidence it relied upon, or did not rely upon, in reaching its drug quantity conclusion. This was error. *See, e.g., United States v. Claybrooks*, 729 F.3d 699, 707 (7th Cir. 2013) (observing that "a district court cannot simply select a number without at least some description of the reliable evidence used to support the findings and the method used to calculate it."). On this record, we cannot conclude that the District Court's factual findings regarding drug quantity at Mark's sentencing hearing met the Guidelines' sufficient indicia of reliability standard. *See Miele*, 989 F.2d at 668 ("[W]e require that the district court articulate more than a conclusory finding [regarding drug quantity]."). We have previously emphasized the "particular scrutiny" that we must apply where the District Court fails to set forth "factual findings relating to amounts of drugs involved in illegal operations, [because] 'the quantity of drugs attributed to the defendant usually will be the single most important determinant of his or her sentence.'" *Brothers*, 75 F.3d at 849 (quoting *United States v. Collado*, 975 F.2d 985, 995 (3d Cir. 1992)). We must, therefore, vacate Mark's sentence and remand for further development of the record and more detailed factfinding.

Given our conclusion that Mark's case should be remanded for resentencing, we need not address his remaining sentencing arguments on appeal. *See United States v. Merced*, 603 F.3d 203, 214 (3d Cir. 2010) ("If the district court commits procedural error, our preferred course is to remand the case for re-sentencing, without going any further."). Mark will have the opportunity to reassert his arguments before the District Court at resentencing, at which

time the District Court must adequately explain its decision accepting or rejecting his arguments in accordance with its duties under *United States v. Gunter*, 462 F.3d 236 (3d Cir. 2006).

### *(3) Substantive Reasonableness*

Freeman disputes only the District Court's factual findings at his sentencing hearing and the record is lacking in any other procedural errors.  We, therefore, conclude that the District Court's sentencing decision was procedurally reasonable.  Because the District Court's sentencing decision passes the first stage of review, we must now turn to the substantive reasonableness of the decision.  *Levinson*, 543 F.3d at 195.

Here, the District Court found, by a preponderance of the evidence, that Freeman was responsible for at least fifty kilograms of cocaine.  Freeman's base offense level was changed to 36 to reflect those findings.  Following an increase of two points, to 38, for his role as an organizer in the conspiracy, and with a criminal history category of I, Freeman's resulting Guidelines range was changed to 235 to 293 months' imprisonment.  Given the statutory maximum of 20 years for Freeman's conviction, the government requested, and the Court applied, a Guidelines range of only 188 to 240 months' imprisonment.  The Court then sentenced Freeman to 188 months' imprisonment.

Because there is no procedural error, and the District Court imposed a within-Guidelines sentence, we may presume the substantive reasonableness of its decision.  *See Gall v. United States*, 552 U.S. 38, 51 (2007) ("If the sentence is within the Guidelines range, the appellate court may . . apply a presumption of reasonableness.").  We can ascertain no abuse of discretion in the Guidelines-range sentence

30

imposed here and we certainly cannot say that "no reasonable sentencing court would have imposed the same sentence on [Freeman] for the reasons the [D]istrict [C]ourt provided." *See Tomko*, 562 F.3d at 568. We therefore reject Freeman's challenge to the substantive reasonableness of his sentence.

### C. Freeman's Remaining Arguments

Freeman's remaining challenges are based upon: (1) an alleged violation of his Sixth Amendment right of confrontation; and (2) an alleged violation of his Sixth Amendment right to present a defense. Both challenges stem from allegations that the District Court imposed excessive limitations on Freeman's cross-examination of Isaac, a witness Freeman describes as critical to his conviction. According to Freeman, had the District Court allowed him to pursue his chosen line of questioning, he would have demonstrated that Isaac was a biased, corrupt, and unreliable witness, and that Isaac's participation in the scheme and transportation of money to the Virgin Islands was unrelated to the charged conspiracy.

We review a district court's limitation on cross-examination for an abuse of discretion. *United States v. Lore*, 430 F.3d 190, 208 (3d Cir. 2005). We will generally not disturb a district court's discretion in this regard "'unless no reasonable person would adopt [its] view.'" *United States v. John-Baptiste*, 747 F.3d 186, 211 (3d Cir. 2014) (quoting *Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 519 (3d Cir. 2003)). If we determine that there was an abuse of discretion, we then review the error to see if it was harmless. *United States v. Casoni*, 950 F.2d 893, 902 (3d Cir. 1991).

### (1) Sixth Amendment Right of Confrontation

The Sixth Amendment "guarantees the right of an accused in a criminal prosecution 'to be confronted with the

31

witnesses against him.'" *Davis v. Alaska*, 415 U.S. 308, 315 (1974). "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Id.* at 315-16; *see also Chambers v. Mississippi*, 410 U.S. 284, 295 (1973) (observing that the right of cross-examination is implicit in the constitutional right of confrontation). This affords an opponent the opportunity to test the believability and truthfulness of a witness's testimony through the "direct and personal putting of questions and obtaining [of] immediate answers." *Davis*, 415 U.S. at 316. Impeachment strategies have included the introduction of evidence of a prior criminal conviction of the witness or exposing a witness's motivation for testifying, "directed toward revealing possible biases, prejudices, or ulterior motives . . . as they may relate directly to issues or personalities in the case at hand." *Id.*

The use of such strategies is always subject "to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation." *Id.*; *see also Wright v. Vaughn*, 473 F.3d 85, 93 (3d Cir. 2006). We have established a two-part test to determine whether a judge's limitation on cross-examination violates the Confrontation Clause:

> First, we must determine whether that ruling inhibited [a defendant's] effective exercise of her right to inquire into [the] witness's "motivation in testifying"; and second, if the District Court's ruling did significantly inhibit [the defendant's] exercise of that right, whether the constraints it imposed on the scope of [the] cross-

> examination fell within those "reasonable limits" which a trial court, in due exercise of its discretion, has authority to establish.

*United States v. Silveus*, 542 F.3d 993, 1006 (3d Cir. 2008) (quoting *United States v. Chandler*, 326 F.3d 210, 219 (3d Cir. 2003)).

In the instant case, Freeman's counsel attempted to elicit the names of other individuals Isaac had previously sold drugs for, including individuals not involved in the instant conspiracy. In doing so, Freeman's counsel asked: "Other than Mr. Springette, other than Elton Turnbull, other than any of the defendants in this courtroom, were you selling cocaine for anyone else in the entire universe?" *See* Transcript of Proceedings at 310, United States v. Mark, No. 3:06-cr-00080-CVG-RM (D.V.I. Mar. 25, 2011), ECF No. 590. The government objected to that line of questioning and the District Court sustained that objection, ruling that such questioning violated Rule 608 of the Federal Rules of

33

Evidence.[7] The District Court rejected the same line of questioning the following day, noting to counsel that he had previously asked Isaac if he had disclosed other illegal affairs to law enforcement and that Isaac had already replied in the affirmative. The Court informed counsel that it was not saying that he could not go into details of criminal conduct for which he had a good-faith basis that Isaac failed to disclose, but rather that counsel must "play by the rules."

Based upon our review of the record, we think it clear that Freeman's Sixth Amendment right of confrontation was not violated here. Given counsel's attempt at eliciting information based upon the witness's knowledge "in the universe," we cannot conclude that the District Court abused its discretion in limiting that overly broad line of questioning. More importantly, the District Court did not entirely foreclose counsel's ability to cross-examine Isaac. It merely explained the basis upon which it sustained objections related to the specific line of questioning and warned counsel to be mindful of the Federal Rules. The record demonstrates that all defense counsel, including Freeman's counsel both before and after the instant objections, had ample opportunity to cross-

---

[7] Rule 608(b) of the Federal Rules of Evidence provides that, "specific instances of conduct of a witness, other than conviction for a crime, may not be proved at trial through extrinsic evidence for the purpose of attacking the witness's character for truthfulness." *United States v. Williams*, 464 F.3d 443, 448 (3d Cir. 2006). A court may, "at its discretion[,] permit questioning about specific instances of conduct on cross-examination, but only if the conduct is probative of the witness's character for truthfulness or untruthfulness." *Id.*; *see also* Fed. R. Evid. 608(b).

examine Isaac. We conclude that there was no abuse of discretion here and will, therefore, reject Freeman's argument that he was not afforded his Sixth Amendment right of confrontation.[8]

### *(2) Sixth Amendment Right to Present a Defense*

Freeman's second claim alleging violation of his Sixth Amendment right to present a defense is based upon the same facts set forth in his confrontation claim. The Supreme Court has observed that "[a] person's right to . . . be heard in his defense – a right to his day in court – are basic in our system of jurisprudence." *Washington v. Texas*, 388 U.S. 14, 18 (1967) (citation and internal quotation marks omitted). "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Id.* at 19. As we concluded above, Freeman had ample opportunity to, and did, present his defense. Freeman's claim, therefore, fails for the same

---

[8] To support his claim that the District Court's actions were improper, Freeman relies on *United States v. Abel*, 469 U.S. 45 (1984). We are unpersuaded by that case. First, *Abel* considered whether certain testimony was *improperly admitted*, whereas, here, Freeman argues that the District Court *should have* admitted certain testimony. Second, Freeman ignores the overarching takeaway from *Abel* that "[a] district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules" and "assessing the probative value of [evidence or testimony] . . . and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment." *Id.* We believe that our decision is in accord with those principles.

reasons his confrontation claim failed. Freeman's Sixth Amendment right to present a defense was properly preserved.

### D. Mark's Remaining Arguments

Mark's remaining challenges are based upon: (1) an alleged variance between his indictment and the evidence presented at trial; and (2) alleged *Brady*[9] violations. We will address each of Mark's arguments in turn.

### *(1) Variance*

Mark argues that his indictment alleged a single conspiracy beginning in 1999 and running through October 2005 between himself and his co-defendants, but that the government's evidence at trial proved multiple separate conspiracies between different individuals and failed to establish his involvement in 1999 and 2000. Mark claims that these variances prejudiced his right "not to be tried en masse for the conglomeration of distinct and separate offenses committed by others." *See Kotteakos v. United States*, 328 U.S. 750, 775 (1946). Based upon those allegations, Mark argues that the District Court should have granted his Rule 29 motion for a judgment of acquittal on Count I.

"A Rule 29 motion for judgment of acquittal obliges a district court to 'review the record in the light more favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'" *Bobb*, 471 F.3d at 494 (quoting *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002)). We review *de novo* an appeal of a district court's

---

[9] *Brady v. Maryland*, 373 U.S. 83 (1963) (*Brady* material refers to discovery that is material and favorable to the defense).

ruling on a "Rule 29 motion and independently appl[y] the same standard as the District Court." *Id.*

"The issue of whether a single conspiracy or multiple conspiracies exist is a fact question to be decided by a jury." *Id.* (citing *United States v. Perez*, 280 F.3d 318, 344 (3d Cir. 2002)). "Where a single conspiracy is alleged in the indictment, there is a variance if the evidence at trial proves only the existence of multiple conspiracies." *Id.*

"Although its objectives may be numerous and diverse, a single conspiracy exists if there is one overall agreement among the parties to carry out those objectives." *Id.* at 494-95 (citing *Braverman v. United States*, 317 U.S. 49, 53-54 (1942)). Bearing that in mind, "a single conspiracy is proved when there is 'evidence of a large general scheme, and of aid given by some conspirators to others in aid of that scheme.'" *Id.* at 494 (quoting *United States v. Reyes*, 930 F.2d 310, 312-13 (3d Cir. 1991)). "A single drug conspiracy 'may involve numerous suppliers and distributors operating under the aegis of a common core group.'" *Id.* (quoting *United States v. Quintero*, 38 F.3d 1317, 1337 (3d Cir. 1994)). Regardless of the circumstances, "the Government must demonstrate that the defendant 'knew that he was part of a larger drug operation.'" *Id.* (quoting *Quintero*, 28 F.3d at 1337).

The aforementioned principles find their roots in the notion that all defendants have a substantial right "not to be tried en masse for the conglomeration of distinct and separate offenses committed by others . . . ." *Kotteakos*, 328 U.S. at 775. This notion was set forth in *Kotteakos*, a multi-defendant conspiracy case, wherein the Supreme Court examined a discrepancy between evidence presented at trial and the allegations set forth in the indictment. *Id.* at 752. In that case, thirty-two defendants were charged with

37

participating in a single general conspiracy to obtain fraudulent government loans. *Id.* At trial, the government proved the existence of at least eight conspiracies, rather than the unitary scheme charged in the indictment. *Id.* at 755. The evidence suggested that the defendants all transacted business with the same key figure, but no other connection was ever established between the defendants. *Id.* at 754. Despite this inconsistency, a jury convicted the defendants, and the court of appeals affirmed. *Id.* at 753.

On the defendants' appeal to the Supreme Court, the government conceded the existence of variance, but claimed that the defendants' rights were not prejudiced. *Id.* at 767. The Supreme Court disagreed and reversed, noting first that the defendants faced a prejudicial burden in preparing for trial as they were forced to prepare defenses to numerous separate schemes to which they had no connection. *Id.* at 766-67. The Supreme Court then noted that the trial court also gave the jury misleading instructions, which confused the proof necessary to establish each defendant's participation in the single conspiracy. *Id.* at 767. This accumulation of errors, the Supreme Court concluded, was highly prejudicial to the defendants' individual cases and likely "had [a] substantial and injurious effect or influence on determining the jury's verdict." *Id.* at 776.

We faced a similar issue in *United States v. Camiel*, 689 F.2d 31 (3d Cir. 1982). In that case, the defendants were charged with participating in a single political patronage scheme, designed to defraud the Commonwealth of Pennsylvania through the use of the United States mails. *Id.* At the close of the case, the trial judge entered a judgment of acquittal in favor of the defendants, concluding that there was a variance between the offenses charged in the indictment and the proof offered at trial. *Id.* at 33. We affirmed the

judgment directing a verdict of acquittal because the government presented its evidence in a confusing manner that complicated the jury's task of determining the guilt of each *individual* defendant. *Id.* at 38 (emphasis added). We concluded that the variance was prejudicial because "the volume and manner of presentation of the evidence created the likelihood of spillover - i.e., that the jury might have been unable to separate offenders and offenses and easily could have transferred the guilt from one alleged co-schemer to another." *Id.*

Mark argues that his case is similar to both *Camiel* and *Kotteakos*. He contends that the government's evidence established separate and distinct conspiracies as follows: (1) Springette's organizational conspiracy from the 1980's until 1999, when he was arrested; (2) Turnbull's organizational conspiracy while Springette was in jail; (3) Springette's organizational conspiracy after his escape from jail in 2001 until his capture in 2002; (4) Isaac's organizational conspiracy in North Carolina until his arrest in 1999; (5) Isaac's organizational conspiracy after his release from prison in 2003; (6) Swan's organizational conspiracy in Baltimore, Philadelphia, and New York; (7) a conspiracy involving an individual named Meleek Sylvester and the Sun Shine Air offices at the airport in St. Thomas; and (8) a conspiracy-related contact at the airport in St. Thomas that pre-dated Mark's involvement with Springette and Turnbull. He argues that the government deliberately exposed the jury to all of the other defendants' crimes in hopes that the jury would transfer Springette's, Turnbull's, Isaac's, and Sylvester's admissions of guilt to him.

We disagree. The government presented evidence which, construed in its favor, demonstrated Mark's involvement and leadership role in a single, although

39

extremely complex, drug trafficking conspiracy. The evidence to which Mark points, combined with the overwhelming testimony against him, illustrates the connection between the different members of the conspiracy, the different locations involved, the objective of the conspiracy, and Mark's connection to all of it. Contrary to Mark's assertions, the government's evidence permitted a reasonable inference that each act or transaction that occurred during the drug trafficking scheme was in support of the ultimate goal of the drug trafficking organization - to import large quantities of drugs into the United States. *See Bobb*, 471 F.3d at 494 (noting that the government "may bear [its] burden entirely through circumstantial evidence." (citation omitted)).

Mark's claim regarding the discrepancy in the start date of his involvement with the conspiracy fails as well. He alleges that Turnbull could not testify with certainty whether Mark's involvement with the organization began in 1999 or 2000. However, the record demonstrates that Turnbull testified to two different encounters between himself and Mark, at least one of which was in 1999. The first encounter concerned an exchange of approximately $40,000-$50,000 and the second related to discussions of drug-trafficking routes. In that regard, Mark claims that the government failed to prove that the money that was exchanged between himself and Turnbull was related to the drug conspiracy charged or that he even knew what the money was for. We reject that argument as well, because a jury could reasonably infer that the conduct at issue was both related to drugs and in furtherance of the conspiracy charged, especially given the rest of the evidence and testimony presented at trial. *See, e.g., United States v. Claxton*, 685 F.3d 300, 311 n.17 (3d Cir. 2012) ("Our task . . . is simply to determine whether the jury

could have rationally concluded that [a defendant] knowingly participated in the drug conspiracy . . . ."). Given Turnbull's testimony, there was no discrepancy between the start time of the conspiracy as charged and the evidence presented at trial. Mark's variance argument fails.

### *(2)* Brady *Violations*

Mark's second argument, regarding *Brady* violations, sets forth that three years after his conviction, during the 2010 trial of several of his co-defendants and after all of the remaining counts against him had been dismissed, he became aware of numerous letters written by key witnesses who testified against him at his 2007 trial. Mark specifically points to: (1) letters by and between Springette and Turnbull to Federal Agents and Attorneys (the "Turnbull and Springette Letters"); and (2) letters by and between Turnbull and Isaac (the "Isaac Letters"). Mark alleges that the Turnbull and Springette Letters discuss the expectations and agreements between the government and the witnesses, and detail the consideration they would receive in exchange for their testimony and cooperation. The content of those letters, according to Mark, contradicts the witnesses' trial testimony. The Isaac Letters to which Mark refers concern testimony by Turnbull wherein he admitted that he communicated with Isaac about putting a case together against someone. Mark contends that those letters were never produced to any defense counsel.

Alleged *Brady* violations often involve mixed questions of fact and law. *United States v. Perdomo*, 929 F.2d 967, 969 (3d Cir. 1991). We, therefore, review a district court's conclusions of law *de novo*, and review any findings of fact for clear error. [10] *Id.*

*Brady* provides that "the suppression by the prosecution of evidence favorable to an accused, upon request by the defense, violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). A valid *Brady* claim, therefore, consists of three elements: (1) "the prosecution must suppress or withhold evidence, (2) which is favorable, and (3) material to the defense." *United States v. Perdomo*, 929 F.2d 967, 970 (3d

---

[10] Mark filed a motion for a new trial shortly before his sentencing hearing, which was premised upon the aforementioned *Brady* violations. There is no indication in the record that the District Court ever ruled on Mark's motion for a new trial. We note, however, that "the denial of a pending motion may be implied by the entry of final judgment." *United States v. Jasso*, 634 F.3d 305, 307 n.2 (5th Cir. 2011) (citing *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994) ("The denial of a motion by the district court, although not formally expressed, may be *implied* by the entry of a final judgment or of an order inconsistent with the granting of the relief sought by the motion.")); *accord United States v. Depew*, 210 F.3d 1061, 1065 (9th Cir. 2000) ("We treat the district court's failure to rule on Depew's motion as a denial of it."). For purposes of this appeal, we deem the District Court's failure to rule on Mark's motion as an implicit denial of his motion for a new trial and will, therefore, review this conclusion *de novo*.

Cir. 1991) (citing *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972)). Once these elements have been met, a new trial is justified. *Brady*, 373 U.S. at 87.

That same rule applies where, as in the instant case, witness testimony is at issue. *See id.* at 154. "[W]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility" will provide the requisite justification for a new trial. *Id.* (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). The Supreme Court has cautioned, however, that "[w]e do not . . . automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict.'" *Id.* at 154 (quoting *United States v. Keogh*, 391 F.2d 138, 148 (2d Cir. 1968)). A new trial is warranted only where "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . ." *Id.* (quoting *Napue*, 360 U.S. at 271).

Applying the aforementioned principles to the instant case, we conclude that Mark's claim regarding the Turnbull and Springette Letters fails at the first prong of the *Brady* analysis. The Court has reviewed the letters at issue in the

record[11] of one of his co-defendants, and it is apparent from those documents that the Turnbull and Springette Letters post-date Mark's 2007 trial. Because there is no record evidence that the letters even existed at the time of Mark's trial, he cannot, therefore, establish prejudice as a result of the government's non-disclosure. We will reject mark's *Brady* claim as to the Turnbull and Springette Letters.

Mark's *Brady* claim regarding the Isaac Letters fails on the first prong of the analysis as well. The record demonstrates that Mark's counsel was both in possession of, and had knowledge of, the Isaac Letters in 2007, *see* Transcript of Proceedings at 158-68, United States v. Mark, No. 3:06-cr-00080-CVG-RM (D.V.I. Jan. 17, 2008), ECF No.

---

[11] Mark's *Brady* claim hinges on the fact that, even to this day, the government has failed to produce the Turnbull and Springette Letters. However, Mark makes specific reference to the content of the letters throughout the entirety of his argument without explaining how he knows the content of the letters or directing our attention to specific points in the 2010 trial of his co-defendants where the issue ultimately arose. One could infer here that this means that he has seen the documents and/or interacted with someone who had access to them. Mark's failure to obtain or present those materials to this Court, despite the overwhelming public record filed in connection to this case, appears to be an attempt to create a *Brady* issue by not obtaining and presenting the documents for our review. Nevertheless, we have reviewed the letters that are the subject of Mark's *Brady* claim, *see* Notice of Filing by Craig Claxton, United States v. Mark, No. 3:06-cr-00080-CVG-RM (D.V.I. July 26, 2010), ECF No. 1154, and will take judicial notice for purposes of our analysis. *See* Fed. R. Evid. 201(b)(2).

593, the same letters that he claims that he never received and did not become aware of until after his co-defendants' trial in 2010.[12]  In that portion of the 2007 transcript, Attorney Colon, Mark's counsel at trial, cross-examined Turnbull regarding certain communications between himself and Isaac:

> Ms. Colon: . . . Sir, isn't it also true that not only did Glenson Isaac send you letters, but that you sent Glenson Isaac letters, after your arrest?
>
> Turnbull: That is correct.
>
> Ms. Colon: And, in fact, you communicated with Glenson on a number of occasions, correct - - . . . by writing?
>
> Turnbull: On only two, maybe three occasion [sic].
>
> * * *
>
> Ms. Colon: And, in fact, didn't you also advise Mr. Isaac that you

_____

[12] Mark also claims that he never had the opportunity to cross-examine Turnbull and Isaac about the content of the Isaac Letters.  As this analysis demonstrates, that contention is simply false.

45

> needed some assistance so you could put together a case against [someone] . . . Somebody you called Mob?
>
> Turnbull: Okay.  That's correct.

*Id.* at 158-161.  Those questions were clearly in reference to the Isaac Letters.  The government then objected to the defense's failure to give the letters to the government:

> Counsel for Government: I learned Friday, the Friday before trial, I talked to this witness for an hour.  He told me that he had given some letters to Mr. Isaac, which he knew had been given to the defense.  I've asked for those letters repeatedly.  We have never got them.  She has them and is reading from them.  . . . And I have a right to see the documents, if she's going to continue cross examination, at least for the purposes of redirect.

*Id.* at 162.   In response to the government's objection, Attorney Colon confirmed her possession of the letters, responding: "[T]his is not my case-in-chief, and *I have not decided whether or not I'm going to use these letters* in my case-in-chief.  It depends on what this witness testifies to on

cross-examination. There may not be any need to use those letters in my case-in-chief." *Id.* at 163 (emphasis added).

Based upon the record before us, it appears that Mark's counsel, but not the government, possessed the Isaac letters. This severely undercuts Mark's contention that the government suppressed or withheld evidence in violation of *Brady*. In addition, because the record makes clear that Mark was in possession of some of the Isaac Letters, but he fails to produce any record evidence of them before this Court, we can neither determine whether any additional letters exist, nor can we analyze their content. Without such evidence, Mark cannot demonstrate, beyond the point of mere speculation, that additional letters exist beyond those he already had in his possession in 2007. The mere possibility that additional letters may exist, without more, is insufficient to establish the existence of a *Brady* violation. *United States v. Ramos*, 27 F.3d 65, 71 (3d Cir. 1994) ("We think it unwise to infer the existence of *Brady* material based upon speculation alone."). Because Mark had the Isaac Letters in his possession at his 2007 trial, and he has not demonstrated, beyond mere speculation, that any additional letters exist, we cannot conclude that that the government has suppressed or withheld any evidence relating to the Isaac Letters from the defense. We will reject Mark's claim that a *Brady* violation has occurred.

## IV. CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgments of conviction and sentence as to Freeman. We will affirm the District Court's judgment of conviction as to Mark, but will vacate the judgment of sentence and remand for resentencing for further development of the record.

47