NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 13-3221, 13-3263, & 13-3383
_____

UNITED STATES OF AMERICA

v.

JOSEPH MASSIMINO, a/k/a Mousie; DAMION CANALICHIO, a/k/a
DAME; and ANTHONY STAINO, JR., a/k/a ANT,
Appellants
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal No. 2-09-cr-00496-004,
2-09-00496-008, 2-09-cr-00496-001)
District Judge: Hon. Eduardo C. Robreno
_____
Submitted Under Third Circuit L.A.R. 34.1(a)
September 10, 2015
_____

Before: VANASKIE, SLOVITER and RENDELL, *Circuit Judges*

(Filed: January 15, 2016)
_____

OPINION*
_____

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

VANASKIE, *Circuit Judge.*

Appellants  Joseph Massimino, Damion Canalichio, and Anthony Staino, Jr., are reputed members of the Philadelphia La Cosa Nostra (LCN), an organized crime ring, who were convicted of or pleaded guilty to a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d).  Over the course of a lengthy trial, the Government presented evidence that Appellants conspired to engage in both (1) a pattern of racketeering activity that included extortion, loansharking, and illegal gambling, as well as (2) the collection of unlawful debt.[1]  Appellants now raise various challenges to their convictions and sentences.  For the following reasons, we will affirm.

I.

In January 2011, a federal grand jury in the Eastern District of Pennsylvania returned a Third Superseding Indictment against fourteen defendants, including Appellants, in connection with their involvement in the Philadelphia LCN and its

---

[1] "Unlawful debt" is defined as:

> a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate[.]

18 U.S.C. § 1961(6).

criminal activity over a number of years. Appellants and eight other defendants were charged with participation in a RICO conspiracy in violation of 18 U.S.C. § 1962(d) (Count 1). Massimino was also charged with one count of conspiracy to conduct an illegal gambling business, in violation of 18 U.S.C. § 371 (Count 43), and two counts of conducting an illegal gambling business, in violation of 18 U.S.C. § 1955 (Counts 44 and 48). Canalichio was charged with two counts of conducting an illegal gambling business (Counts 47 and 49). Staino was charged with eleven counts of collection of unlawful debt, in violation of 18 U.S.C. § 1962(c) (Counts 2–12); two counts of conspiracy to make extortionate extensions of credit, in violation of 18 U.S.C. § 892(a) (Counts 24 and 39); one count of conspiracy to collect extensions of credit by extortionate means, in violation of 18 U.S.C. § 894(a)(1) (Count 25); ten counts of collection of extensions of credit by extortionate means, in violation of 18 U.S.C. § 894(a)(1) (Counts 13-23); one count of conspiracy to conduct an illegal gambling business (Count 43); one count of conducting an illegal gambling device business (Count 44); and one count of conducting an illegal sports bookmaking business, in violation of 18 U.S.C. § 1955 (Count 49).

In October 2012, Appellants and four other defendants proceeded to trial in the District Court for the Eastern District of Pennsylvania. The trial, which lasted over four months, included thousands of pages of testimony from dozens of FBI agents, cooperators, and other government witnesses. Some witnesses described discrete interactions with specific defendants, while others provided testimony as to the LCN's

3

coded jargon and hierarchical structure.[2]  The Government also introduced voluminous amounts of wiretap material and other covertly recorded conversations.  The evidence on the whole established that the Philadelphia LCN, as an organization, exercised control over illegal gambling, bookmaking, and loansharking operations, all bolstered by implicit or explicit threats of physical violence.  For the sake of brevity, we will restate only the facts necessary for resolution of this appeal.

### A.  Massimino

The evidence at trial was that Massimino was not only a made member of the Philadelphia LCN, but that at times he served as the Family's underboss, or second-in-command.  The Government's case against Massimino was based on his participation in at least four separate activities: (1) the illegal operation of video poker machines; (2) the extortion of M&P Vending; (3) the annual collection of a "street tax" from bookmaker Jack Buscemi; and (4) the attempt to collect on an unlawful loan from debtor Jerry Iamurri.  We briefly detail those incidents below.

At trial, the Government demonstrated that Massimino, as manager of an LCN establishment known as Lou's Crab Bar, oversaw the collection of illegal gambling proceeds from two video poker machines at that location.  In a series of raids conducted

---

[2] Retired FBI Special Agent Joaquin Garcia explained that each LCN family has a boss, an underboss, and a "consigliere."  Supp. App. 899–900.  Below that fall "caporegimes," who serve as crew captains; "made" members, also called "soldiers"; and associates, whom Garcia described as "worker bees."  Supp. App. 900–04.

in April 2001, the FBI seized dozens of the Philadelphia LCN's video poker machines. Massimino and Joseph Ligambi, a co-defendant and the purported boss of the Philadelphia LCN, attempted to stem their losses from the FBI's raid by acquiring a still-existing video poker route operated by M&P Vending, a company co-owned by government trial witness Joseph Procaccini and grand jury witness Paul Drzal. Procaccini testified that in May 2001, he and Drzal were asked to meet with Massimino and Ligambi at Lou's Crab Bar. Knowing that the two were LCN members, Procaccini offered Ligambi and Massimino a share of M&P Vending's profits so the two would "leave [Procaccini and Drzal] alone." Supp. App. 4217–18. Procaccini was concerned for his safety, testifying "we would get hurt if we didn't play ball with them," Supp. App. 4220–21, and that he "was afraid of getting beat up or getting hurt in some way" if they resisted, Supp. App. 4277.

At the end of the meeting, Massimino instructed Procaccini and Drzal to prepare a list of M&P Vending's video poker locations, which they did. Days later Massimino introduced them to Staino, who accompanied them to the machines and replaced the locks on the machines' cash receptacles, effectively placing them under LCN control. Procaccini refused subsequent demands from Massimino and Staino that he sign an agreement of sale formally conveying the video poker machines to them. He conceded that he accepted roughly $63,000 from Massimino and Staino over the following months, but asserted that this was only a portion of the profit from the machines and that he never would have voluntarily sold the machines at that price.

The Government also introduced evidence that Massimino, acting on behalf of the Philadelphia LCN, extorted bookmaker Jack Buscemi, who testified that he paid "Christmas money" to the LCN so he could operate his bookmaking business without "disruption," such as interference with the business or physical violence. Supp. App. 2615–17. Buscemi testified that in 2002, he met with Massimino at Lou's Crab Bar and delivered a $7,500 "Christmas payment." Supp. App. 2627–28. In 2003, Buscemi made a second payment to Massimino for the same purpose.

In March 2004 Massimino was convicted on state racketeering charges in New Jersey, but even while incarcerated, he continued to participate in LCN affairs. Before reporting to state prison, Massimino told Buscemi that an LCN associate, Gaeton Lucibello, would be collecting future payments, which Buscemi made to Lucibello in 2004, 2005, and 2006. The Government also introduced recordings of Massimino's prison calls, on which Massimino instructed LCN associate Robert Verrecchia on how to handle the illegal gambling proceeds at Lou's Crab Bar in Massimino's absence.

Finally, the Government produced a letter seized from Massimino's outgoing prison mail pursuant to a federal subpoena. In the letter, Massimino asked a friend, Archie Rosenberg, to communicate a threat to an LCN debtor, Jerry Iamurri, regarding an outstanding $35,000 loan. The letter stated, in part:

> Get in touch with Michael [Curro] and tell him to tell his mother to tell her husband [Jerry Iamurri] that he better get my fuckin money. I don't care who the fuck he owes he better get mine. This mother fucker owes me 35,000. I don't care if he has to rob a bank. He fuckin better get my money. .

6

. . I'm tired of the stories and bullshit. He won't be able to hide anywhere in the U.S.

Supp. App. 5680.

## B. Canalichio

The Government's evidence at trial was that Canalichio was a made member of the LCN who participated extensively in the organization's illegal bookmaking and loansharking. To establish Canalichio's general status in the LCN, the Government introduced recorded conversations in which other LCN members referred to Canalichio's induction into the LCN and discussed his incarceration status. The Government also introduced photos recovered from Canalichio's home in which Canalichio was seen posing with Philadelphia LCN notables, including Massimino. The bulk of the substantive evidence against Canalichio, however, came from (1) the testimony of cooperating witnesses who had been subjected to collection efforts; (2) recorded conversations substantiating those accounts; and (3) Canalichio's own words on a wiretapped phone. We will briefly recount that evidence here.

In January 2002, cooperating witness Peter Albo, himself a bookmaker, incurred a $16,000 debt placing sports bets with Philadelphia LCN associates and codefendants Louis Baretta and Gary Battaglini. When he proved unable to pay, Battaglini threatened to "put a bullet in [Albo's] head." Supp. App. 5160. Unbeknownst to the LCN, Albo was under investigation by the FBI, and had agreed to cooperate with them. The FBI arranged for Albo to introduce Baretta and Battaglini to "Vinny," purportedly another

7

bookmaker but in reality Joseph Stone, an undercover FBI agent. In February 2002, Albo arranged a meeting in which Stone agreed to assume Albo's debt and channel his future sportsbook action through Baretta and Battaglini rather than Albo.

In May 2002, Stone went to a deli owned by Battaglini to pay his gambling debts. There he was introduced to Canalichio, who told Stone he mostly did "collections," but that he also accepted sports bets on football games. Supp. App. 5233. Stone complained to Canalichio that he wasn't getting the betting "lines" early enough for his customers' satisfaction. *Id.* Canalichio told Stone he would "talk to the guy" about getting the information more quickly, and affirmed that he would "tighten that up by Monday." Supp. App. 5232–33. Other recorded conversations revealed Canalichio's direct participation in the bookmaking business as a debt collector and advisor on business matters. Additionally, portions of his profits were funneled to Philadelphia LCN leaders, including Ligambi, and in one instance directly to the spouse of an imprisoned LCN member.

Apart from the bookmaking business, Canalichio provided protection for an LCN video poker operation at the First Ward Republican Club (FWRC), a private social club in South Philadelphia operated by codefendant and made LCN member Eric Esposito. In March 2006, Esposito told Canalichio that a customer had started a fight inside the FWRC and pulled a gun. Canalichio told Esposito: "[F]ind out where he lives[,] I'm gonna come down tonight. I, I got to get this motherfucker." Supp. App. 5300. After reporting the incident to another LCN member, Canalichio called Esposito back and told

8

him: "I'm gonna go see him tonight and then we'll take a ride[,] we'll go find this motherfucker and talk to him." Supp. App. 5307. Canalichio also added that if the customer returned to the FWRC, "I'll come down and fuckin' crack his head real quick." Supp. App. 5308.

The Government also introduced testimony that Michael Orlando, a cooperating witness, took out a $5,000 "street loan" from Canalichio at an extortionate interest rate in 2001. Supp. App. 526. When Canalichio went to prison later that year, Orlando stopped making payments, but was soon confronted by Baretta and Battaglini, who threatened him and attempted to collect payments on Canalichio's behalf. In April 2002, after Canalichio's release, he confronted Orlando and explained that he was collecting the debt on behalf of the LCN because the money belonged to Ligambi. In a separate meeting, Baretta threatened Orlando with violence from Canalichio: "[I]f this guy don't like you he's capable of cracking you. . . . It ain't coming from me but him, he, he would do it." Supp. App. 5107. On other occasions Canalichio described to Orlando his use of physical violence to collect other unpaid debts.

The Government also introduced evidence that in December 2005, cooperating witness Joseph Comerer obtained a $500 street loan from Baretta and Battaglini. When Comerer failed to repay the debt, Canalichio participated in collection efforts, and Battaglini eventually threatened Comerer with a voicemail message that if he again failed to make payment, "it's either I give ya' another call back or I send [Canalichio] up to see you. Now you take your choice." Supp. App. 5155.

9

## C. Staino

The Government's evidence at trial was that Staino was a made member of the Philadelphia LCN and a self-described "CFO" of one of the local LCN factions, Supp. App. 5249, and in one meeting with a neighboring LCN Family was introduced as a caporegime. Witnesses testified that Staino was regularly seen in Ligambi's company at Lou's Crab Bar, and from there participated in many of the Philadelphia LCN's operations, including loansharking, money laundering, and illegal gambling.

Specifically, the Government introduced evidence that beginning in 2001, Staino extended loans to Henry Scipione, another FBI cooperator. In 2003, Scipione arranged for Staino to meet "Dino," a self-proclaimed money launderer who was in reality David Sebastiani, an undercover FBI agent. Sebastiani agreed to cover a debt of $12,000 owed to Staino by another undercover FBI agent. On one occasion Staino told Sebastiani: "I'm not gonna pressure anybody until it comes to a situation where there is nothing there. Then there's a problem." Supp. App. 5242. In a later meeting, Sebastiani asked Staino if he could recommend someone to serve as "muscle" in connection with a cash transaction. Staino App. 289. Staino introduced Sebastiani to LCN associate Robert Ranieri, who then met with Sebastiani. On three occasions thereafter, Sebastiani paid Staino after Ranieri participated as a bodyguard in staged money-laundering transactions.

In another instance in 2004, Sebastiani himself sought a $25,000 loan from Staino, which Staino offered at the interest rate of $3,000 a month, but with the caveat that Sebastiani would be hurt if he couldn't repay the loan on time. After Sebastiani attested

10

that he would repay the money, Ranieri gave Sebastiani a cereal box containing $25,000 in cash, but again emphasized that Staino "can turn into a fucking devil, just like that." Supp. App. 5262. Ranieri also repeatedly warned Sebastiani not to talk to Staino about the loan over the telephone. When Sebastiani later told Staino he wanted to repay the loan in full, Staino requested $20,000 in cash, a $5,000 check from Sebastiani's business account, and an IRS Form 1099 to support the check payment, all of which Sebastiani delivered to Ranieri shortly thereafter.

To prove that Staino had engaged in money laundering, the Government presented a financial analysis of JMA Industries, Inc. (JMA), a corporation created by Staino on behalf of Ligambi, Massimino, and himself to accommodate the cash flow from their video poker operation. An FBI agent testified that from July 2002 through June 2009, JMA's bank records showed deposits of $684,073 in cash and withdrawals of $107,977.63 in the form of checks payable to a person named Olivia Ligambi for "payroll." Supp. App. 4854. Curt Arbitman, a cooperating witness who serviced video poker machines for JMA, testified that to his knowledge, JMA had no employees, and he had never heard of anyone named Olivia Ligambi. Supp. App. 3980.

D.

In January 2013, after roughly three months of testimony, jury deliberations began. As we discuss in greater detail below, a juror was dismissed after disclosing potentially contaminating information regarding a defense witness, after which an alternate juror was empaneled and the jury began deliberations anew. On February 5,

11

2013, the jury returned a mixed verdict, finding Massimino guilty on Count 1 (RICO conspiracy), but failing to reach a unanimous verdict on Count 43 (conspiracy to conduct an illegal gambling business) and Counts 44 and 48 (conducting an illegal gambling business). The jury convicted Canalichio, too, on Count 1 (RICO conspiracy), but acquitted him on Count 47 (conducting an illegal gambling device business) and Count 49 (conducting an illegal sports gambling business). The jury found Staino guilty on Count 24 (conspiracy to make an extortionate extension of credit), and Count 25 (conspiracy to collect an extension of credit by extortionate means), but acquitted him on Counts 2 through 23, 29, and 49. The jury was unable to reach a unanimous verdict against Staino on Count 1 (RICO conspiracy), Count 43 (conspiracy to conduct an illegal gambling device business), and Count 44 (conducting an illegal gambling device business). On April 18, 2013, Staino pleaded guilty to those three counts.

In July 2013, the District Court sentenced Appellants in separate proceedings, which we address in detail below. The Court sentenced Massimino to 188 months' imprisonment, three years of supervised release, and a $5,000 fine; Canalichio to 137 months' imprisonment, three years of supervised release, and a $1,000 fine; and Staino to 97 months' imprisonment, three years of supervised release, and a $7,500 fine. The Court further ordered Appellants to forfeit 86 seized video poker machines and $8,000 in seized cash. Appellants filed timely notices of appeal.

II.

The District Court had subject matter jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

III.

Appellants raise a great number of legal challenges to their convictions and sentences, some collectively and some individually. We will first address Appellants' challenges to the sufficiency of the evidence, then turn to other arguments which they believe warrant a reversal of their convictions. Lastly we address Appellants' challenges to their sentences.

A.    Sufficiency of the Evidence

All three Appellants challenge the sufficiency of the evidence against them— Massimino and Canalichio as to Count 1, charging a RICO conspiracy under 18 U.S.C. § 1962(d), and Staino as to Count 25, charging conspiracy to collect extensions of credit by extortionate means under 18 U.S.C. § 894. Our review of the sufficiency of the evidence is "highly deferential." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc). The well-established standard is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). "[T]he verdict must be upheld as long as it does not 'fall below the threshold of bare rationality.'" *Caraballo-Rodriguez*, 726 F.3d at 431 (quoting *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012)).

To establish a RICO conspiracy under 18 U.S.C. § 1962(d), the government must prove the following three elements:

> (1) two or more persons agreed to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt;
>
> (2) the defendant was a party to or a member of the agreement; and
>
> (3) the defendant joined the agreement, knowing of its objective to conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity or collection of unlawful debt, and intending to join with at least one other co-conspirator to achieve that objective.

*Salinas v. United States*, 522 U.S. 52, 63 (1997). The government need not prove that the defendant agreed to commit, or personally committed, two acts of racketeering activity, and instead must establish only that the defendant agreed that a pattern of racketeering activity or a collection of unlawful debt would be accomplished through co-conspirators. *See id.* at 65–66.

Massimino's argument on this point is that even if the Philadelphia LCN itself constituted a far-reaching RICO conspiracy, no evidence existed that he knowingly joined it. He contends that he was never the underboss of the Philadelphia LCN family, but at most "just another made guy," Massimino Br. at 15, whose affiliation with the LCN, without more, was not a criminal act, *see United States v. Pungitore*, 910 F.2d 1084, 1146 (3d Cir. 1990). He further suggests that any illegal loansharking he engaged in was a personal enterprise unrelated to the LCN.

14

Proof of Massimino's specific rank within the LCN was not an element of the Government's RICO case against him. Even so, contrary to Massimino's assertions, the Government introduced ample evidence that Massimino was more than just a rank-and-file member of the Philadelphia LCN. Two cooperating witnesses testified regarding their belief that he served as the Family's underboss—testimony bolstered by a recorded phone conversation in which Massimino agreed with another person's characterization of him as "the underboss." Supp. App. 5603a. And the Government's witnesses, whom the jury was entitled to credit, established that Massimino's loansharking and extortion occurred as part of the broader LCN enterprise. Jack Buscemi, for instance, testified that Massimino repeatedly exacted a "street tax" from him in connection with an LCN protection racket, and further evidence permitted the conclusion that Massimino later directed the continued collection of the "tax" from Buscemi with the assistance of another LCN made member even while incarcerated. Michael Orlando, too, testified that he was summoned to see Massimino in connection with an unpaid LCN debt to Canalichio, and that he was fearful of LCN retribution if he were to leave the debt unsatisfied. On this basis a rational juror could have inferred that Massimino knowingly joined the LCN conspiracy to engage in a pattern of racketeering activity and collection of unlawful debt.[3]

---

[3] Massimino also argues that under *United States v. Gaudin*, 515 U.S. 506 (1995), the jury was required to find the commission of two specific racketeering acts by proof beyond a reasonable doubt. In *Gaudin*, the Court recognized a criminal defendant's

Canalichio, too, contends that the evidence was insufficient to support his conviction for RICO conspiracy. Time and again, however, the record, viewed in the light most favorable to the Government, demonstrates Canalichio's knowing participation in the business of the Philadelphia LCN, both in the context of issuing loans and accepting bets, and threatening violence to those who failed to square their accounts. Thus, for largely the same reasons applicable to Massimino's conviction, we reject Canalichio's challenge to the sufficiency of the evidence.

Staino's conviction on Count 1, unlike Massimino's and Canalichio's, was the result of a guilty plea rather than a jury verdict, and accordingly, he does not challenge the sufficiency of the Government's proof on that count. He does contend, however, that the Government's proof was insufficient to support his conviction on Count 25, charging him with conspiracy to collect extensions of credit by extortionate means in violation of 18 U.S.C. § 894(a)(1). The Government responds that when Staino pleaded guilty on Count 1, he explicitly conceded that this same conviction that he now challenges served

_____

"right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged." *Id.* at 522–23. But *Gaudin* does not warrant relief here. Commission of individual racketeering acts is not an element of RICO conspiracy, *see Salinas*, 522 U.S. at 65–66, and a jury may find a defendant guilty of such conspiracy even while returning a verdict of acquittal on separately charged individual acts of racketeering activity. *See United States v. Yannotti*, 541 F.3d 112, 128–29 (2nd Cir. 2008). Further, the District Court is obligated to make findings regarding "underlying racketeering activity" for purposes of sentencing, U.S.S.G. § 2E1.1, and such findings must be supported only by a preponderance of the evidence. *See United States v. Ciaverella*, 716 F.3d 705, 735–36 (3d Cir. 2013).

16

as a valid factual predicate to support the RICO conviction. His attorney, too, represented that "we have agreed . . . that the two acts, the Counts 24 and 25 in the indictment that he was found guilty of would serve as a basis for the factual basis for the RICO conspiracy plea and the conviction. Everything else . . . is frosting on the cake." App. 5461.

We agree with the uncontroversial view of the Second Circuit that a defendant waives any appellate challenge to the sufficiency of the evidence when he pleads guilty to an offense. *See United States v. Maher*, 108 F.3d 1513, 1528–29 (2d Cir. 1997). And where the defendant expressly concedes that one of the elements of the pleaded offense is itself satisfied by the fact of a prior conviction, as it was here, it follows that the defendant waives any later challenge to the sufficiency of the evidence underlying that predicate conviction. Therefore, we conclude that Staino's instant claim, which is tantamount to an assertion that his RICO plea did *not* have a factual basis, has been waived.

In the alternative, we conclude that the Government introduced sufficient evidence to support the jury's finding of guilt on Count 25. 18 U.S.C. § 894 provides:

> (a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means (1) to collect or attempt to collect any extension of credit, or (2) to punish any person for the nonrepayment thereof, shall be fined under this title or imprisoned not more than 20 years or both.
>
> (b) In any prosecution under this section, for the purpose of showing an implicit threat as a means of collection, evidence may be introduced tending to show that one or more

17

> extensions of credit by the creditor were, to the knowledge of the person against whom the implicit threat was alleged to have been made, collected or attempted to be collected by extortionate means or that the nonrepayment thereof was punished by extortionate means.

18 U.S.C. § 894. "Extortionate means" is defined as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any other person." *Id*. § 891(7). Staino contends that here, any threats were made at the time of the extension of the loan, rather than during its collection, which is insufficient to satisfy § 894. *See United States v. Lore*, 4 F. Supp. 2d 352, 357 (D.N.J. 1998).

We need not decide the correctness of *Lore*'s holding—a question we have not addressed in a precedential holding—because this case is distinguishable. Staino was convicted of conspiracy to use extortionate means to collect an extension of credit, rather than of the substantive offense itself. Regardless of whether Sebastiani repaid the relevant debts without himself falling into arrears or being threatened—an arguable point which we need not address—the Government's evidence on the whole would allow a rational juror to conclude that Staino conspired with Ranieri and others to employ threats of violence not just in the extension of credit but also in the collection of debts. Accordingly, we will affirm Staino's conviction on Count 25.

### B. Miscellaneous Arguments

#### 1. Jury Contamination

After five days of jury deliberations, Juror Nine commented to the other jurors that five years earlier, she had heard from a friend that defense witness Jerry Davis was "not a good, honest person." Massimino App. 324. When informed of this disclosure, the District Court immediately halted deliberations, dismissed Juror Nine, and conducted a thorough, individualized voir dire of each remaining juror to discern the extent to which, if any, the information had affected those jurors' ability to remain fair and impartial.

During the course of the voir dire, Juror Two and Juror Five expressed initial hesitation regarding the extent to which the extraneous information might impact their ability to assess the evidence fairly and impartially. Upon further questioning, however, both jurors unequivocally expressed an ability to disregard the extraneous information and to remain fair and impartial. On that basis the District Court denied Appellants' motions for a mistrial and to dismiss Jurors Two and Five. The Court then further instructed the jury to begin deliberations anew and admonished the jury to disregard the extraneous information and decide the case solely on the basis of the evidence presented in court. After those instructions, the jury deliberated for an additional sixteen days before rendering a mixed verdict. The District Court later denied Canalichio's motion for a new trial based on jury contamination.

We review the district court's decision whether to grant a mistrial on the basis of juror exposure to extraneous information for an abuse of discretion. *See United States v. Urban*, 404 F.3d 754, 777 (3d Cir. 2005). "A new trial is warranted if the defendant likely suffered 'substantial prejudice' as a result of the jury's exposure to the extraneous

19

information." *United States v. Fumo*, 655 F.3d 288, 304 (3d Cir. 2011) (quoting *Urban*, 404 F.3d at 777). "The party seeking a new trial bears the burden of demonstrating a likelihood of substantial prejudice." *Urban*, 404 F.3d at 777.

Our protocol for determining whether extra-judicial information adversely affected the jury is as follows: "First, a court determines whether the [information] is prejudicial. Second, if it is, the court determines whether any jurors were exposed to the [information]. Third, if exposure did occur, the court examines the exposed jurors to determine if this exposure compromised their impartiality." *Waldorf v. Shuta*, 3 F.3d 705, 709–10 (3d Cir. 1993) (citing *United States v. Jackson*, 649 F.2d 967, 976 (3d Cir. 1981)). Here, the Government does not dispute that the information was prejudicial, and that all jurors were exposed to the information. We thus direct our attention to the third step, which requires consideration of the following factors:

> whether (1) the extraneous information . . . relate[s] to one of the elements of the case that was decided against the party moving for a new trial; (2) the extent of the jury's exposure to the extraneous information; [(3)] the time at which the jury receives the extraneous information; [(4)] the length of the jury's deliberations and the structure of the verdict; [(5)] the existence of instructions from the court that the jury should consider only evidence developed in the case; and (6) whether there is a heavy volume of incriminating evidence[.]

*Fumo*, 655 F.3d at 307 (citations and internal quotation marks omitted).

The information at issue here concerned the character of a single defense witness in the much broader context of a lengthy, complex trial. Specifically, the defense had called Davis to attack the character of Louis Monacello, a cooperating witness who

20

testified that, among other things, Massimino conducted illegal gambling activities at Lou's Crab Bar, as charged in Count 48 of the Indictment. But as noted earlier, the jury acquitted Massimino on Count 48. This compels the conclusion that Davis's testimony regarding Monacello's character was, if anything, credited by the jury despite the extraneous information. We thus conclude that the District Court did not abuse its discretion in denying Appellants' motions for relief based on juror contamination.

2. Expert Testimony

Massimino and Canalichio argue that the District Court wrongly admitted certain expert testimony of retired FBI Special Agent Joaquin Garcia, a longtime undercover agent in the world of organized crime. Expert opinion testimony is admissible if it will assist the jury "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). We review the admission of expert testimony for abuse of discretion. *See United States v. Mathis*, 264 F.3d 321, 335 (3d Cir. 2001).

At trial, Garcia testified that he had spent over two years embedded in the New York Gambino LCN Family, during which he became familiar with the LCN's hierarchical structure, methods of operation, jargon, and the rank and identity of many specific members. Appellants do not dispute that Garcia was properly qualified as an expert with respect to his knowledge of the LCN; instead, they object primarily to Garcia's testimony regarding the content of covertly recorded conversations between high-ranking members of New York and Philadelphia LCN families. Garcia testified that those conversations, cast by Appellants as innocent chatter at a social gathering, were rife

21

with LCN jargon and oblique references to LCN members by nickname. In summation the Government suggested that Garcia's testimony provided the context necessary for the jury to determine whether Appellants had knowingly participated in a RICO conspiracy.

We have consistently held that expert testimony regarding the structure and nature of the LCN, and its methods of operation and terminology, falls within the scope of Rule 702. *See Pungitore*, 910 F.2d at 1148–49; *United States v. Theodoropoulos*, 866 F.2d 587, 592 (3d Cir. 1989), *overruled on other grounds*, *United States v. Price*, 76 F.3d 526, 528 (3d Cir. 1996); *United States v. Riccobene*, 709 F.2d 214, 230–31 (3d Cir. 1983). Garcia's testimony, including his description of the rank and identity of many non-defendant LCN members, was properly admitted to help the jury understand certain conversations and evaluate their probative value with respect to Appellants' alleged involvement in a RICO conspiracy. Appellants' remaining minor objections to the basis for or content of Garcia's expert testimony are meritless. Accordingly, we will not grant relief on this basis.[4]

---

[4] In his opening brief, Canalichio also objected to the expert testimony of FBI Special Agent John Augustine regarding the meaning of certain gambling and bookmaking jargon. Because Canalichio did not object to that testimony at trial, we review for plain error. *See United States v. Boone*, 279 F.3d 163, 174 n.6 (3d Cir. 2009). As above, we see no error with the District Court's admission of this testimony to assist the jury in understanding coded words or phrases common in racketeering activity. *See United States v. Vastola*, 899 F.2d 211, 232-34 (3d Cir. 1990), *rev'd on other grounds*, 497 U.S. 1001 (1990). Nor does our review of the record reveal any instances in which Augustine's factual and expert testimony became problematically intermingled. *See, e.g.*, *United States v. Garcia*, 752 F.3d 382, 392–95 (4th Cir. 2014).

3. Cross-Examination Regarding Disciplinary Infractions

Massimino and Canalichio raise evidentiary and constitutional challenges to the District Court's preclusion of cross-examination of three FBI agents regarding certain disciplinary infractions present in their personnel files.[5] Rulings on the scope of cross-examination under Federal Rule of Evidence 608(b) and the Confrontation Clause of the Sixth Amendment are reviewed for abuse of discretion. *See United States v. Freeman*, 763 F.3d 322, 341 (3d Cir. 2014). Under both Rule 403 and the Sixth Amendment, the district court may preclude cross-examination where the evidence is of marginal relevance or will result in unfair prejudice or confusion of the issues. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). The court must assess whether the jury had sufficient information, "'without the excluded evidence, to make a discriminating appraisal of the possible biases and motivation of the witness[].'" *United States v. Chandler*, 326 F.3d 210, 219 (3d Cir. 2003) (quoting *Brown v. Powell*, 975 F.2d 1, 4 (1st Cir. 1992)). Further, "if judicial self-restraint is ever desirable, it is when a [Federal] Rule 403 analysis of a trial court is reviewed by an appellate tribunal." *United States v.*

We also note that the vast majority of the legal arguments made in Canalichio's reply brief—including claims that Agent Augustine's testimony violated the rule against testimonial hearsay set forth in *Crawford v. Washington*, 541 U.S. 36 (2004), and constituted an impermissible "overview" of the Government's case, *see United States v. Flores-de-Jesus*, 569 F.3d 8, 17–18 (1st Cir. 2009)—were not raised in Canalichio's opening brief on appeal. We therefore deem those arguments waived. *See Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993).

[5] To avoid the necessity of filing this opinion under seal, we will avoid referring to the three agents by name.

*Universal Rehab. Servs. (PA), Inc.*, 205 F.3d 657, 665 (3d Cir. 2000) (en banc) (quoting *United States v. Long*, 574 F.2d 761, 767 (3d Cir. 1978)).

At issue here is a 2008 incident in which three testifying FBI Agents were administratively sanctioned after an investigation revealed that they and other agents had improperly consulted an answer key while taking a test on FBI internal investigative guidelines. The FBI Office of Professional Responsibility concluded that the agents had exhibited "a serious lack of judgment" that violated FBI Offense Code 5.22, which prohibits employees from "[e]ngaging in conduct, while on duty, which dishonors, disgraces, or discredits the FBI; seriously calls into question the judgment or character of the employee; or, compromises the standing of the employee among his peers or his community." Massimino App. 158, 178. The investigation also concluded, however, that the agents had not committed an act of dishonesty or untruthfulness. One agent received a two-day suspension, while the two others were each suspended for one day.

The Government moved in limine to preclude Appellants from cross-examining the agents on the administrative adjudications at issue. The District Court concluded that the evidence was not admissible under Federal Rule of Evidence 608(b), which permits attacks on a witness's credibility through evidence of past untruthfulness, and that the evidence was more prejudicial than probative under Rule 403. The Court further concluded that precluding cross-examination on the disciplinary adjudications would not violate the Confrontation Clause because the probative value of the evidence was

24

minimal, and was substantially outweighed by the prejudicial factors described in Rule 403.

We see no error in the District Court's rulings with respect to the scope of cross-examination. First, we agree with the District Court that the OPR's finding of "a serious lack of judgment," without more, does not amount to specific conduct probative of untruthfulness under Rule 608(b). Second, the District Court's application of the balancing test required by Rule 403 and the Confrontation Clause was not an abuse of discretion. Introduction of the administrative adjudications here would have required a lengthy detour in an already complex trial. Nor was it likely that cross-examination regarding these adjudications, which were completely unrelated to the matter at hand, would have revealed any additional bias or motive for the agents to shape their testimony against Appellants. In sum, we will affirm the District Court's limitations on the scope of cross-examination.

4. Medical Records and Cross-Examination of Michael Orlando

Massimino and Canalichio argue that the District Court improperly denied defense requests for the medical records of Michael Orlando, a government witness whose trial testimony was interrupted by a hospital stay after the start of cross-examination. They further contend that under Rule 403, the District Court should have permitted them to cross-examine Orlando on past and ongoing drug use. Our review, as above, is for abuse of discretion. *See Freeman*, 763 F.3d at 341.

25

At trial, Orlando testified on direct examination that he had taken out a $5,000 street loan from Canalichio, and that Canalichio and other LCN members later threatened Orlando with violence to collect the principal and interest on the loan. Defense counsel began cross-examining Orlando on Friday, October 26, but did not finish that day. When trial resumed on the following Wednesday, the Government reported that Orlando was temporarily unavailable due to illness after being taken to the hospital. Later, after *in camera* review of Orlando's medical records, the District Court directed the Government to disclose Orlando's discharge summary to defense counsel.[6] When cross-examination of Orlando resumed on November 2, defense counsel did not question Orlando regarding the discharge summary, despite having had the opportunity to do so. Additionally, the Court permitted defense counsel to question Orlando as to medical matters that might affect his testimony, such as the ongoing use of prescription pain relievers.

We discern no error in the District Court's limitations on the scope of Orlando's cross-examination. Defense counsel received adequate notice of the reason for Orlando's unavailability and were permitted to cross-examine him regarding his ongoing use of prescription drugs, including as to whether such use occurred in violation of his cooperation agreement. Appellants fail to demonstrate that the District Court abused its discretion by precluding cross-examination on periods of drug use that were not germane

---

[6] Again, to avoid the necessity of filing this opinion under seal, we will not refer to the specific contents of the discharge summary.

to this case. Additionally, defense counsel thoroughly impeached Orlando on many other grounds, including that he had been convicted of felony fraud charges, had committed numerous other uncharged felonies, had received probation in exchange for his cooperation, and had made prior inconsistent statements. Consequently, even without the excluded evidence, which was of limited probative value, the jury was able "to make a discriminating appraisal of the possible biases and motivation of the witness[]." *Chandler*, 326 F.3d at 219 (quotation marks and citation omitted). Accordingly, Massimino and Canalichio have not established a right to a new trial based upon the District Court's narrow rulings on the scope of the cross examination of Orlando.[7]

### 5. The Rosenberg Letter

Massimino challenges the District Court's denial of his motion to suppress the letter he sent to Archie Rosenberg while incarcerated on state racketeering charges in 2005. At the time, a federal grand jury had issued a subpoena for Massimino's written correspondence to the New Jersey prison where Massimino was housed. Prison officials directed an investigator to open and read Massimino's incoming and outgoing mail, after which they discovered the Rosenberg letter. The District Court denied Massimino's motion to suppress the letter at trial. We review a ruling on a motion to suppress

---

[7] Massimino argues for the first time in his reply brief that the Government violated the constitutional protections described in *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose certain facts pertaining to Orlando's medical incident. Because that argument was not raised in Massimino's opening brief, we deem it waived. *See Kost*, 1 F.3d at 182.

evidence for clear error as to the underlying factual findings, and exercise plenary review over the district court's application of the law to the facts. *See United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

Massimino directs us to *Procunier v. Martinez*, 416 U.S. 396 (1974), in support of his contention that the seizure here violated the Fourth Amendment. He also argues that the opening of the letter violated New Jersey Administrative Code 10A:18-2.7, which provides that certain outgoing correspondence "shall not be opened . . . unless there is reason to believe that the correspondence contains disapproved content . . . and then only with the prior approval of the administrator or designee." *Id.* "[D]isapproved content" includes "information concerning activities within or outside the correctional facility which would be subject to criminal prosecution under the laws of New Jersey or the United States." N.J. Admin. Code § 10A:18-2.14.

The Government is correct that *Procunier* pertained to First Amendment claims rather than Fourth Amendment claims, and in any event has since been overruled. *See Thornburgh v. Abbott*, 490 U.S. 401, 413–14 (1989). Instead, the correct standard is provided by *Stroud v. United States*, 251 U.S. 15, 21–22 (1919), which established that prison officials may open prisoner mail without violating the Fourth Amendment by following established regulations and ensuring that "such seizures are prompted by reasonable justification," *United States v. Brown*, 878 F.2d 222, 225 (8th Cir. 1989). Here, the District Court found that the federal grand jury subpoena and other information provided prison officials with a reasonable basis to believe that the correspondence was

28

related to Massimino's ongoing participation in illegal LCN activities. We are satisfied that the District Court's factual findings and legal conclusions on this issue were correct.

### C. Sentencing

All three Appellants raise various challenges to their sentences. We review sentences for procedural and substantive reasonableness, and the party challenging the sentence bears the burden of demonstrating unreasonableness. *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc). First, we examine the record for significant procedural errors "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51 (2007).

If no procedural errors exist, we consider the substantive reasonableness of the sentence. *Id.* The District Court "must demonstrate that it reasonably applied [the § 3533(a)] factors to the circumstances of the case." *United States v. Bungar*, 478 F.3d 540, 543 (3d Cir. 2007). Our review is "highly deferential." *Id.* "[U]nless no reasonable sentencing court would have imposed the same sentence," we affirm. *Tomko*, 562 F.3d at 568.

#### 1. Massimino

Massimino contends that the District Court erred by sentencing him based on a total offense level of 30, rather than 19. He agrees that under U.S.S.G. § 2E1.1, his base

29

offense level was the greater of 19 or the offense level applicable to the criminal activity underlying his racketeering conviction.

Here, the District Court concluded that the trial evidence established Massimino's involvement in four groups of underlying racketeering activity: illegal gambling involving video poker machines; the extortion of M&P Vending; the extortion of Jack Buscemi; and the conspiracy to collect an extortionate extension of credit from Jerry Iamurri. The second group, pertaining to M&P Vending, carried a base offense level of 18, which was increased by 2 levels for an expressed or implied threat of death or bodily injury, and 2 levels for the financial loss to M&P Vending. The Court then applied a 4-level enhancement under U.S.S.G. § 3B1.1(a) for Massimino's status as an organizer or leader of racketeering activity, and another 4-level enhancement under § 3D1.4 because Massimino had participated in four groups of underlying racketeering activity. This resulted in a total offense level of 30, which, when combined with Massimino's criminal history category of V, produced an advisory guidelines range of 151 to 188 months.

Massimino's main argument is that the District Court should not have considered the four groups of underlying racketeering activity for purposes of sentencing because the jury acquitted Massimino on certain counts pertaining to that activity, and did not return a special verdict indicating its factual findings on the uncharged matters. The sentencing court, however, is permitted to consider evidence of both uncharged acts and evidence underlying counts on which the defendant has been acquitted, so long as such conduct has been proved by a preponderance of the evidence. *See* U.S.S.G. § 1B1.3, *Background*;

*United States v. Watts*, 519 U.S. 148, 157 (1997). The District Court was on sound footing in crediting testimony from Government witnesses that squarely supported the four underlying categories of racketeering activity.

Massimino also challenges the factual basis for the 4-level sentencing enhancement he received for his role as "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ." U.S.S.G. § 3B1.1.(a). Relevant factors for a leadership enhancement include the exercise of decision-making authority, the nature of the defendant's participation in the offense, the degree of participation in the planning or organization of the offense, the nature and scope of the illegal activity, and the defendant's control and authority over other participants. U.S.S.G. § 3B1.1, n.4. We review the District Court's factual determinations with respect to § 3B1.1 for clear error. *United States v. Helbling*, 209 F.3d 226, 243 (3d Cir. 2000).

Here, aside from acknowledging the title of "underboss," Massimino repeatedly exercised decision-making authority and displayed influence or control over others in the execution of the LCN's illegal activities. This included his role in the extortion of M&P Vending and the collection of illegal payments from Jack Buscemi through Gaeton Lucibello. Further, the District Court was entitled to conclude that, even while incarcerated, Massimino supervised Robert Verrecchia's continuation of illegal activities at Lou's Crab Bar. On these facts we cannot conclude that the District Court committed clear error by designating Massimino an organizer or leader of the Philadelphia LCN.

31

Lastly, Massimino references *Kimbrough v. United States*, 522 U.S. 85 (2007), in which the Supreme Court recognized the admonition that criminal sentences must be "'sufficient, but not greater than necessary,' to accomplish the goals of sentencing . . . ." *Id.* at 101 (quoting 18 U.S.C. § 3553(a)). Without significant elaboration, he contends that the sentence here was substantively unreasonable and greater than necessary to accomplish the goals of sentencing.

The District Court explicitly considered the sentencing factors of 18 U.S.C. § 3553(a). Initially, the District Court found that Massimino had committed "an extremely serious offense." Supp. App. 5546. The Court also commented on Massimino's lengthy criminal history, lack of remorse, and likelihood of recidivism:

> I can only conclude, Mr. Massimino, that you don't get it, you never have gotten it, you have dedicated your life to a life of crime, something which is not permitted in a civilized society.
>
> Your own statements here today went to totally excuse . . . your conduct. There was not a word of regret or remorse, not any comment that "I made the wrong choices," or "I hung around the wrong people, I am sorry for what I have done."
>
> Rather, you were defiant to the end. You attacked the prosecutors, you attacked the probation officer, others are responsible for your lot, and while that was entirely appropriate at the time of trial you stand here convicted of these crimes.
>
> There is nothing before me today that bodes well for your future as a law-abiding citizen regardless of all of those virtues and talents that you have.

32

Supp. App. 5549–50. The Court then imposed a prison term of 188 months, the top of the advisory guidelines range.[8]

In light of the abundant evidence of Massimino's long-term involvement in a paradigmatic RICO conspiracy, his lack of remorse, and the seriousness of the criminal activity, we find that the District Court's sentence fell well within its considerable discretion. Accordingly, we will affirm the Massimino's sentence.

2.  Canalichio

As with Massimino, the District Court applied U.S.S.G. § 2E1.1 and found that Canalichio had participated in four groups of underlying racketeering activity: sports bookmaking and illegal gambling at the FWRC; the extortion of Michael Orlando; the extortion of Peter Albo;[9] and the extortion of Joseph Comerer. The latter three offenses, which constituted violations of 18 U.S.C. § 892, carried a base offense level of 20. The Court applied an additional 2-level enhancement after finding that Canalichio was a manager or supervisor of racketeering activity under U.S.S.G. § 3B1.1(c), and then, again as with Massimino, applied a 4-level increase based on the grouping under § 3D1.4. This

_____

[8] Both Massimino and Canalichio qualified as career offenders under U.S.S.G. § 4B1.1, which could have resulted in an advisory guidelines imprisonment range of 210 to 240 months. Because of an open question as to whether RICO conspiracy constitutes a crime of violence, the District Court applied the rule of lenity and opted not to sentence them as career offenders. Supp. App. 5512. The Government does not appeal from this determination.

[9] With respect to the Albo extortion, the District Court found that although Canalichio did not directly participate in the extortionate debt collections, the activities of Battaglini and Baretta in extorting Albo were foreseeable to Canalichio.

33

led to a total offense level of 26. Combined with a criminal history category of V, Canalichio faced an advisory guidelines imprisonment range of 110 to 137 months. After considering the nature of the criminal activity and Canalichio's involvement in it, the District Court imposed a sentence of 137 months' imprisonment, at the top of the advisory guidelines range.

Canalichio's challenge to the District Court's offense-level calculations is somewhat different from Massimino's. He argues that his offense level should have been governed by U.S.S.G. § 1B1.2(d), which provides that "conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." *Id.* Federal courts have interpreted that provision to require, where the jury returns only a general verdict, that the Government prove each underlying object of the conspiracy beyond a reasonable doubt to the court sitting as a trier of fact. *See, e.g.*, *United States v. Farese*, 248 F.3d 1056, 1061 (11th Cir. 2011).

Four of our sister courts of appeals have concluded that § 1B1.2(d) does not apply to a RICO conspiracy, which "is considered a single object conspiracy with that object being the violation of RICO." *United States v. Carrozza*, 4 F.3d 70, 79–80 (1st Cir. 1993); *see also United States v. Garcia*, 754 F.3d 460, 483 (7th Cir. 2014); *United States v. Yannotti*, 541 F.3d 112, 129–30 (2d Cir. 2008); *United States v. Massino*, 546 F.3d 123, 134–36 (2d Cir. 2008); *United States v. Corrado*, 227 F.3d 528, 542 (6th Cir. 2000). *But see Farese*, 248 F.3d at 1059 (concluding that a RICO conspiracy is a multi-object

34

conspiracy). Our own precedent has not squarely addressed the applicability of §

1B1.2(d) to a RICO conspiracy, but we have affirmed the underlying principle that a

RICO conspiracy is a single-object conspiracy in which defendants agree to violate the

RICO statute itself, rather than to commit a multitude of separate underlying criminal

acts. *See Riccobene*, 709 F.2d at 224–25. Accordingly, we agree that U.S.S.G. §

1B1.2(d) has no bearing on these facts.

Canalichio's second argument is that the record fails to support the District

Court's application of a 2-level managerial enhancement under § 3B1.1(c). The record,

however, supported the conclusion that Canalichio was a made member of the

Philadelphia LCN, and that in hierarchical terms, he was responsible for supervising LCN

associates such as Baretta and Battaglini. This hierarchy was substantiated by testimony

that (1) Baretta and Battaglini collected or attempted to collect debts on Canalichio's

behalf from Orlando and Comerer, and (2) Canalichio exercised managerial discretion

with respect to Baretta and Battaglini's bookmaking operation. In light of this evidence,

the District Court did not clearly err in applying a 2-level managerial enhancement.

Finally, we conclude that the District Court adequately considered the

factors listed in 18 U.S.C. § 3553(a) and imposed a substantively reasonable sentence at

the top of the advisory guidelines range. Accordingly, we will affirm Canalichio's

sentence.

    3.   Staino

Staino argues that the District Court erred at sentencing by (1) overruling his objections to the conduct described in the PSR; (2) failing to adequately consider all factors set forth in 18 U.S.C. § 3553(a); and (3) miscalculating his offense level. To reiterate, Staino was convicted of conspiracy to make an extortionate extension of credit (Count 24), and conspiracy to collect an extension of credit by extortionate means (Count 25). After the jury hung on Count 1 (RICO conspiracy), Count 43 (conspiracy to conduct an illegal gambling device business), and Count 44 (conducting an illegal gambling device business), Staino later pleaded guilty to those counts.

At sentencing, the District Court applied U.S.S.G. § 3D1.2(a) and found Staino responsible for four groups of underlying racketeering activity: the illegal video poker machine operation; the extortion of M&P Vending; the loansharking transactions with agent Sebastiani; and the laundering of gambling and racketeering proceeds. Staino objected to the PSR's findings pertaining to the extortion of M&P Vending and the charge of money laundering. The District Court overruled Staino's objections on both counts, finding Procaccini credible regarding the extortion of M&P Vending and concluding that the Government had introduced sufficient evidence of money laundering.[10] As with Massimino, the Court concluded that the extortion of M&P Vending resulted in an adjusted offense level of 22, which was further increased to 25 by

---

[10] The Court did note that it was not relying on the PSR's findings as to Staino's alleged extortion of Henry Scipione and Frank DiGiacomo, because the jury had acquitted Staino of the related substantive counts.

36

virtue of a 3-level enhancement for Staino's managerial role under U.S.S.G. § 3B1.1(b). The Court then applied a 4-level enhancement under § 3D1.4. Lastly, the Court granted a 1-level downward adjustment for acceptance of responsibility based upon Staino's post-trial guilty plea. This resulted in a total offense level of 28 which, combined with Staino's criminal history category of I, led to an advisory guidelines range of 78 to 97 months' imprisonment.

The District Court next proceeded to address each of the sentencing factors listed in 18 U.S.C. § 3553(a). The Court found that Staino had committed "an extremely serious offense," and that the Philadelphia LCN "has a long history of committing crimes, the seriousness of which cannot be underestimated." Staino App. 859. The Court acknowledged that Staino was not a recidivist and that he had offered both character testimony and letters at sentencing, but found that a sentence at the low end of the guidelines range "would deprecate the importance of the sentencing statement that is being made here today." Staino App. 864. The Court then sentenced Staino to 97 months' imprisonment, at the top of the advisory Guidelines range.

Staino's main objection is that the District Court erred by applying a 3-level managerial-role enhancement under U.S.S.G. § 3B1.1(b). As with Massimino and Canalichio, however, the record demonstrates that Staino repeatedly exercised managerial discretion over other criminal participants during the course of the RICO conspiracy. With respect to M&P Vending, Staino supervised Curt Arbitman, the LCN associate who maintained the video poker machines, as well as the individual operators of

37

the video poker "stops" on the route taken from Procaccini and Drzal. Further, when Agent Sebastiani asked Staino for "muscle" to assist in a money-laundering transaction, Staino repeatedly provided assistance from Ranieri, an LCN associate, and collected payment afterward. And when Sebastiani took out a $25,000 loan from Staino, Ranieri delivered the money and noted that he could not answer certain questions regarding repayment without checking with Staino. On these facts we find that the District Court did not abuse its discretion by applying a 3-level managerial enhancement.

We further conclude that the District Court did not err by overruling Staino's objections to the PSR's statements regarding M&P Vending and money laundering. In both instances the District Court was entitled to credit the testimony of government witnesses that, if believed, supported Staino's participation in those offenses.

We will also affirm the District Court's denial of a 2-level downward adjustment under § 3E1.1(a) for acceptance of responsibility. Staino pleaded guilty only after being found guilty of certain other offenses by a jury, and even then denied the vast bulk of the Government's evidence at sentencing. The District Court credited Staino nonetheless by granting a 1-level downward variance for acceptance of responsibility. Where Staino's guilty plea came late in the game and after putting the Government to its proof at trial, we see no basis on which to conclude that the District Court abused its discretion by declining the full 2-level adjustment for acceptance of responsibility under § 3E1.1(a). And finally, we conclude that the District Court adequately considered the factors listed

38

in 18 U.S.C. § 3553(a) and imposed a substantively reasonable sentence at the top of the advisory guidelines range.

IV.

For the forgoing reasons, we will affirm the judgment of the District Court.